*This opinion is subject to revision before publication*

## UNITED STATES COURT OF APPEALS
### FOR THE ARMED FORCES

———————

**UNITED STATES**
Appellee

**v.**

**Stephan H. CLAXTON, Cadet**
United States Air Force, Appellant

**No. 17-0148**
Crim. App. No. 38188 (rem)

Argued May 9, 2017—Decided July 6, 2017

Military Judges: J. Wesley Moore (trial) and Natalie D. Richardson (*DuBay* hearing)

For Appellant: *Major Jarett Merk* (argued); *Colonel Jeffrey G. Palomino.*

For Appellee: *Major Mary Ellen Payne* (argued); *Colonel Katherine E. Oler* (on brief); *Gerald R. Bruce*, Esq.

Judge STUCKY delivered the opinion of the Court, in which Judges RYAN, OHLSON, and SPARKS, joined. Chief Judge ERDMANN filed a separate dissenting opinion.

———————

Judge STUCKY delivered the opinion of the Court.

We granted review to determine whether the Government's failure to disclose to the defense that a Government witness was an informant, in violation of *Brady v. Maryland,* 373 U.S. 83 (1963), was harmless beyond a reasonable doubt.[1] We hold that it was and therefore affirm the judgment of the United States Air Force Court of Criminal Appeals (CCA).

### I. Background

On March 16, 2012, Appellant, a cadet attending the United States Air Force Academy (USAFA), was charged

———————

[1] We originally granted review of an additional issue concerning whether Appellant's conviction must be set aside in light of our decision in *United States v. Hills,* 75 M.J. 350 (C.A.A.F. 2016). The order granting review of that issue was vacated on March 20, 2017.

with sexual offenses against two women: one incident was in March and the other in November 2011. At Appellant's trial, Cadet Eric Thomas testified for the prosecution as to both incidents.

Cadet Thomas entered the USAFA in August 2009. Within the year, he was placed on academic probation, where he remained until his disenrollment. Although Cadet Thomas evidently had contact with agents of the Air Force Office of Special Investigations (AFOSI) as early as 2010, he became a registered confidential informant (CI) by December 2011 and remained so until after trial.

Before trial, Appellant's defense counsel submitted a discovery request to the prosecution, dated February 3, 2012, demanding "[t]he names, addresses and phone numbers of all confidential witnesses, including, but not limited to, undercover AFOSI's or Security Forces' informants and/or agents." The prosecution responded, alleging, "Nothing known at this time. Will be provided if/when available."

A general court-martial composed of officers convicted Appellant, contrary to his pleas, of attempted abusive sexual contact and assault of a female cadet (MI), wrongful sexual contact with a former cadet (SW), and assaulting two male cadets.[2] Articles 80, 120, 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 880, 920, 928 (2012). In June 2012, the court sentenced Appellant to a dismissal, confinement for six months, and forfeiture of all pay and allowances. The convening authority approved the adjudged sentence.

On December 1, 2013, the Colorado Springs *Gazette* published an article in which then-former Cadet Thomas identified himself as having been a CI for the AFOSI. Sixteen days later, the CCA affirmed the approved findings and sentence. *United States v. Claxton*, No. ACM 38188, 2013 CCA LEXIS 1045, at *14, 2013 WL 6913102, at *4 (A.F. Ct. Crim. App. Dec. 17, 2013) (unpublished).

On February 14, 2014, based on what he termed "newly discovered evidence" that Cadet Thomas was a CI, Appellant petitioned the Judge Advocate General of the Air Force

---

[2] Appellant was acquitted of wrongful sexual contact with KA.

(JAG) for a new trial under Article 73, UCMJ, 10 U.S.C. § 873 (2012). According to Appellant's trial defense counsel, they were never notified that Cadet Thomas was a CI.

Appellant filed a petition for review at this Court on February 18, 2014. On March 5, 2014, Appellant asked the JAG, in accord with Article 73, UCMJ,[3] to forward his request for new trial to this Court. Noting that Appellant's request for a new trial was filed with the JAG before he filed his petition for review at this Court, government appellate counsel opposed the JAG's referring the petition for new trial to this Court, asserting that the case was not pending before us at the time of filing. Appellate government counsel failed to advise the JAG that, because Appellant's time for filing an appeal at this Court had not expired, the case was still pending before the CCA, and should be referred there. *United States v. Owen*, 6 C.M.A. 466, 470, 20 C.M.R. 182, 186 (1955). The JAG denied the petition on May 21, 2014, determining "that the proposed evidence does not constitute newly discovered evidence justifying a new trial."[4]

On September 15, 2014, this Court granted review of the *Brady* issue, set aside the decision of the CCA, and returned the case to the JAG for remand to an appropriate convening authority to order a hearing pursuant to *United States v. DuBay*, 17 C.M.A. 147, 37 C.M.R. 411 (1967). *United States v. Claxton*, 73 M.J. 478 (C.A.A.F. 2014) (summary disposition). On March 17, 2015, after the *DuBay* hearing was completed, but before the *DuBay* judge issued her findings, appellate government counsel notified her and the defense that another witness also "was likely a confidential informant."

The *DuBay* judge found that the Commandant of Cadets[5] and other senior USAFA leaders, including the staff judge

---

[3] Article 73, UCMJ, provides: "[i]f the accused's case is pending before a Court of Criminal Appeals or before the Court of Appeals for the Armed Forces, the Judge Advocate General shall refer the petition to the appropriate court for action."

[4] As both the JAG and his deputy had retired, and no replacements had yet been appointed, the petition was denied by Major General Robert G. Kenny, USAFR, "Performing the Duties of The Judge Advocate General."

[5] General Richard Clark.

advocate[6] and the chief of justice,[7] knew that Cadet Thomas was a CI for the AFOSI. Furthermore, "an AFOSI agent told former Cadet Thomas not to reveal this status during his pretrial interviews with trial defense counsel." *United States v. Claxton*, No. ACM 38188 (rem), 2016 CCA LEXIS 649, at *9, 2016 WL 6575036, at *3 (A.F. Ct. Crim. App. Oct. 31, 2016) (unpublished). The *DuBay* judge also found no evidence Appellant ever asked the prosecution to disclose whether any witnesses were confidential informants. This finding was clearly erroneous. Apparently she was not familiar with the previous filings supplementing the record at this Court, which had included the pretrial defense discovery request.[8]

The *DuBay* judge noted that the prosecution had given the defense evidence that could be used to impeach Cadet Thomas: a copy of his cadet personnel records, which included the fact that he was on conduct probation; and his squadron commander's recommendation that he be disenrolled.[9]

While the *DuBay* judge never resolved whether the prosecution violated the disclosure obligations of *Brady*, she ruled that the failure to provide the material to the defense was harmless beyond a reasonable doubt. She acknowledged in her findings that the Government had notified her that another witness at Appellant's trial was an AFOSI CI, but as the convening authority had not expanded the scope of the hearing, concluded she could neither review nor consider it.

The CCA concluded that the prosecution violated *Brady* as "the CI information was potentially fertile grounds for

---

[6] Colonel Paul M. Barzler.

[7] Captain Nicklaus Reed.

[8] It appears that the *DuBay* judge was only provided a PDF of the trial transcript, not the entire record, and she was never provided a copy of the defense discovery request. Nevertheless, Appellant's civilian attorney made clear in his opening statement during the *DuBay* hearing that the defense discovery request had specifically demanded disclosure of the identity of any witness who was a confidential informant.

[9] The *DuBay* judge incorrectly states that the records provided to the defense were those of Appellant.

impeachment and thus was discoverable." *Claxton*, 2016 CCA LEXIS 649, at *25, 2016 WL 6575036, at *8.

> Proper disclosure of Cadet Thomas' CI status would have also revealed that from the time Cadet Thomas initiated the contact in November 2011 through the time he testified for the Government at Appellant's trial in June 2012, both Cadet Thomas and AFOSI knew he was going to face disenrollment. Former Cadet Thomas hoped to avoid disenrollment and its collateral consequences of having to pay back the cost of tuition through his work with AFOSI.

*Id.* at *12, 2016 WL 6575036, at *4.

Although no *DuBay* hearing had been conducted concerning the second informant, whose AFOSI CI file was not part of the record, the CCA also attempted to assess the weight of the CI's testimony while still trying to mask the CI's identity. *See id.* at *8, 2016 WL 6575036, at *3. The CCA concluded that the prosecution had violated *Brady* but that it was harmless beyond a reasonable doubt. *Id.* at *25, 2016 WL 6575036, at *8. The CCA reversed one of Appellant's assault consummated by a battery convictions, concluding it was uncorroborated, but otherwise affirmed the approved findings and sentence. *Id.* at *4, 2016 WL 6575036, at *2.

## II. Discussion

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87; *see* Rule for Courts-Martial (R.C.M.) 701(a)(6) (requiring disclosure of evidence known to trial counsel that tends to negate guilt, reduce guilt, or reduce sentence). The Supreme Court has extended *Brady*, holding "that the duty to disclose such evidence is applicable even though there has been no request by the accused, and that the duty encompasses impeachment evidence as well as exculpatory evidence." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citations omitted).

In military practice, "[w]here an appellant demonstrates that the Government failed to disclose discoverable evidence in response to a specific request or as a result of prosecutori-

al misconduct, the appellant will be entitled to relief unless the Government can show that nondisclosure was harmless beyond a reasonable doubt." *United States v. Roberts*, 59 M.J. 323, 327 (C.A.A.F. 2004) (concluding that shifting the burden to the government "reflects the broad nature of discovery rights granted the military accused under Article 46[, UCMJ, 10 U.S.C. § 846 (2012)]"). "Failing to disclose requested material favorable to the defense is not harmless beyond a reasonable doubt if the undisclosed evidence might have affected the outcome of the trial." *United States v. Coleman*, 72 M.J. 184, 187 (C.A.A.F. 2013).

A. Wrongful Sexual Contact—Cadet MI

Cadet MI became ill after consuming alcoholic beverages with other cadets (Appellant, Cadet Thomas, and Cadet RH) and fell asleep on one of the beds in Appellant's room, after which Cadets Thomas and RH left the room. Cadet MI testified that she woke up when someone got into the bed behind her. Based on his body size, she thought it was Appellant. She further testified that the person behind her "grabbed her hand, pulled it behind her back, and placed it on his penis." *Claxton*, 2016 CCA LEXIS 649, at *26, 2016 WL 6575036, at *8. When she got up from the bed, Cadet MI saw Appellant in the bed. After she left the room, she told Cadet Thomas and Cadet RH what happened. She made a restricted report of the incident a few days later.[10]

Approximately a month later, Cadet RH showed Cadet MI a text message he claimed was a copy of a message that

[10] Under DoD's Sexual Assault Prevention and Response (SAPR) Policy, Service members and their adult military dependents have two reporting options - Restricted Reporting and Unrestricted Reporting. Under Unrestricted Reporting, both the command and law enforcement are notified. With Restricted (Confidential) Reporting, the adult sexual assault victim can access healthcare, advocacy services, and legal services without the notification to command or law enforcement. Military retiree, DoD civilian, and DoD contractor victims currently may use only Unrestricted Reporting.

Sexual Assault Prevention and Response Office, Department of Defense, *Restricted Reporting*, http://sapr.mil/index.php/25-reporting-options (last visited July 6, 2017).

Appellant sent to his mother, in which Appellant acknowledged having "'inappropriately touched a female a while back.'" *Id.* at \*27, 2016 WL 6575036, at \*9.

Seven months later, while investigating another sexual incident, AFOSI agents learned that Cadet MI had been assaulted and went to talk to her. A week later Cadet MI changed the status of her sexual assault report from restricted to unrestricted. Cadet MI testified under a grant of immunity because she had consumed alcohol while in the dorms and underage.

Appellant was interviewed by AFOSI agents twice. The first time, he denied touching Cadet MI. "Three days later, … he admitted getting in bed with Cadet MI when she was intoxicated, pulling down his pants and underwear, placing her hand on his leg and then positioning himself so her hand touched his penis for 10–15 seconds." *Id.* at \*26–27, 2016 WL 6575036, at \*9.

B. Specifications Alleging Attempted Abusive Sexual Contact of SW and Assaults of SW, Cadet DB and Cadet Thomas

Approximately seven months after the incident involving Cadet MI, Cadet Thomas invited a former cadet, SW, to dinner with several other cadets. *Id.* at \*29–30, 2016 WL 6575036, at \*10. Over the course of the evening, SW consumed several alcoholic drinks. *Id.* at \*30, 2016 WL 6575036, at \*10. She became so intoxicated that the cadets had to carry her to the car and eventually from the car to their dormitory. *Id.*, 2016 WL 6575036, at \*10. They put SW in Cadet Thomas's bed; his roommate was asleep. *Id.,* 2016 WL 6575036, at \*10. Two of the cadets, neither of whom was an informant, who described themselves as friends of Appellant, testified that when they put SW in the bed, "her clothes were not in disarray." *Id.*, 2016 WL 6575036, at \*10.

> The two cadets testified that Appellant was also in the room at this time but failed to leave with them when they went with former Cadet Thomas to find a mattress for him to use since Ms. SW was in his bed. Instead, Appellant closed and locked the door behind them. The two cadets described knocking loudly on the door. A few minutes later, Appellant opened the door and the two cadets saw the room was dark.

*Id.* at *31, 2016 WL 6575036, at *10.

Appellant tried to shut the door, but Cadet DB pulled him out of the room. *Id.* at *33–34, 2016 WL 6575036, at *11. Appellant struck that cadet in the jaw. Cadet Thomas intervened, separating the two, and Appellant left the area. *Id.* at *34, 2016 WL 6575036, at *11.

> When the light was turned on, the two cadets saw Ms. SW's shirt was now pushed up to her breasts and her pants were unbuttoned with her underwear showing. The resulting commotion awoke former Cadet Thomas' roommate, who also saw Ms. SW's pants unbuttoned and her shirt pulled up. It also brought a third cadet into the room, and he also observed her pants unbuttoned and unzipped and her shirt pulled up.

*Id.* at *31, 2016 WL 6575036, at *10.

Appellant rushed back into the room and struck Cadet DB in the face again. *Id.* at *34, 2016 WL 6575036, at *11. When Cadet Thomas tried to separate the two, Appellant "grabbed him by the throat, hit him in the face and pushed him down on the bed until several cadets forcibly separated the two." *Id.*, 2016 WL 6575036, at *11.

For this conduct, Appellant was convicted of assault consummated by a battery and attempted abusive sexual contact of SW, and two specifications of assault consummated by a battery for striking Cadet DB and striking and choking Cadet Thomas.

> When Appellant was interviewed under rights advisement on 5 and 8 December 2011, he was asked about the events of 4 November 2011. He described drinking with Ms. SW and other cadets (including former Cadet Thomas) while off campus. He told investigators that he ended up extremely intoxicated and was unable to remember all the events that transpired after they returned to the Academy. He recalled being in former Cadet Thomas' dormitory room with former Cadet Thomas, two other cadets and Ms. SW, who was talking incoherently and who then passed out in former Cadet Thomas' bed. As the male cadets started leaving, Appellant remembered one of them saying something offensive that led him to respond and then lock the door before the cadet could re-enter the

room. Appellant told investigators that he put his arm around Ms. SW and that he believed she was "passed out/incoherent" when he did so. He also "strongly believed it [i]s possible" he unbuttoned Ms. SW's jeans but he was not certain since he could not recall doing so or seeing her pants in this condition.

*Id.* at \*32, 2016 WL 6575036, at \*10. He admitted striking Cadets DB and Thomas but claimed he did so in self-defense, and that he had been provoked by other cadets calling him a rapist. *Id.* at \*33, 2016 WL 6575036, at \*11.

### C. The Testimony of the Informants

With respect to the incident involving Cadet MI, neither informant observed the alleged sexual contact nor testified about it. Their testimony was limited to the circumstances surrounding the offense—that Appellant was alone in the room with Cadet MI and had sent a text to his mother about the incident. In light of Appellant's signed, sworn statement to the AFOSI admitting his conduct, the admission of the text message, and the testimony of Cadet MI, the failure to disclose that two of the witnesses were confidential informants was harmless beyond a reasonable doubt. The informants' testimony was relatively unimportant and was for the most part cumulative with that of other witnesses. Furthermore, the *DuBay* judge found that the defense had evidence with which to impeach Cadet Thomas: that his future as a cadet would be short and that testifying in a manner "favorable to the prosecution could get him some leniency."

With regard to the incidents involving SW and the assaults on the cadets, Cadet Thomas was a primary witness. His testimony, however, was corroborated by several other eyewitnesses who were not informants and by Appellant's admission that he might have unbuttoned SW's jeans.

Although the prosecution did not disclose that the two witnesses were confidential informants, there is no reasonable likelihood that this evidence could have affected the judgment of the trial court.

We further conclude that there is no reasonable likelihood that the disclosure of the two witnesses as confidential informants would have affected Appellant's sentence. Alt-

hough an appellant may present evidence in extenuation and mitigation during sentencing, we discern no reason that the status of two witnesses as confidential informants would have led the members to conclude that there was a legal justification for Appellant's misconduct or a reason to reduce Appellant's punishment.

### III. Conclusion

That being said, we cannot allow the gross governmental misconduct which occurred in this case to escape unremarked. It is unclear from the record whether the trial counsel[11] were aware of Cadet Thomas's status, but it was their "'duty to learn of any favorable evidence known to the others acting on the government's behalf …, including the police'" and disclose it to the defense. *Strickler*, 527 U.S. at 281 (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). Here, there is no evidence of record that the trial counsel made any attempt to inquire as to the status of government witnesses as required by the defense discovery request.

Of additional concern is the fact that responsible judge advocates, including the staff judge advocate and the chief of justice, knew that Cadet Thomas was a CI and either did not inform the trial counsel or, if they did, did not ensure that the trial counsel performed their duties under *Brady*. We do not know whether these officers acted at the behest of AFOSI, so that that agency could continue its undercover activities, or for some other reason. In any event, it is profoundly disturbing that officers of the court would engage in such conduct. The fact that, under the applicable standard, the Government has managed to salvage this conviction cannot erase the blot on the Air Force legal system that such conduct must cause. As Justice Sutherland wrote, in the classic statement of prosecutorial responsibility:

> The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very defi-

---

[11] Captains Adam D. Bentz and Paul G. Clawson.

nite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88 (1935).

## IV. Judgment

The judgment of the United States Air Force Court of Criminal Appeals is affirmed.

Chief Judge ERDMANN, dissenting.

Two of the government's witnesses in this case had been confidential informants for the Air Force Office of Special Investigations and had informed on Claxton during the investigative stage of the case. At trial, the government represented to the panel that the two witnesses had been friends of Claxton but, because of their repugnance for what he was accused of, were willing to testify against their former friend. During the entirety of the trial, government counsel did not disclose to the court or the defense that the two had been confidential informants. Had one of the confidential informants not "spilled the beans" during a post-trial media interview, their status may never have been publically known. Before this court, the government concedes that a *Brady v. Maryland*, 373 U.S. 83 (1963), violation occurred and that the standard for determining prejudice is whether the error was harmless beyond a reasonable doubt. As I believe that the *Brady* violation was not harmless beyond a reasonable doubt, I respectfully dissent from the majority opinion and would reverse the United States Air Force Court of Criminal Appeals and return the case for a new trial.[1]

The majority cites the correct standard for analyzing prejudice resulting from a *Brady* violation where a specific discovery request has been made. *See United States v. Coleman*, 72 M.J. 184, 187 (C.A.A.F. 2013) ("Failing to disclose requested material favorable to the defense is not harmless beyond a reasonable doubt if the undisclosed evidence might have affected the outcome of the trial."). However, the majority then takes a somewhat narrow view and fails to consider the entire scope of the potential prejudice in this case.

It is difficult to fault the majority's analysis in which they note that the testimony of the confidential informants was either "relatively unimportant" or "cumulative" with the testimony of other witnesses or Claxton's own admissions. However, I believe there is a bigger picture that the majority does not address. In nondisclosure cases, we have considered the cumulative effect of the nondisclosure rather than merely speculating as to what the

---

[1] I concur with the majority's comments regarding the Air Force's gross misconduct in the prosecution of this case.

result would have been without the confidential informants' testimony. *See United States v. Stellato*, 74 M.J. 473, 490 (C.A.A.F. 2015). In conducting this assessment, we have adopted the following analysis: (1) whether the nondisclosure hampered or foreclosed a strategic option; (2) whether the nondisclosure hampered the ability to prepare or present its case; (3) whether the nondisclosure substantially influenced the factfinder; and (4) whether the nondisclosure would have allowed the defense to rebut evidence more effectively. *Id.* (citations omitted). This court "need not conclude that Appellant's defense would have succeeded. Instead the inquiry should focus on whether the military judge's ruling essentially deprived Appellant of [his] best defense that may have tipped the credibility balance in Appellant's favor." *United States v. Collier*, 67 M.J. 347, 356 (C.A.A.F. 2009) (alteration in original) (internal quotation marks omitted) (quoting *United States v. Moss*, 63 M.J. 233, 239 (C.A.A.F. 2006)). At the *United States v. DuBay*, 17 C.M.A. 147, 37 C.M.R. 411 (1967), hearing, the defense argued that "[h]ad [they] known the full picture about [the confidential informants] [they] may have posited a different theory about what happened that night and why."

On appeal to this court, Claxton argues that the confidential informants were not unbiased passive observers to the three charged incidents, but were government agents who played a role in creating the events leading up to each of the three alleged sexual misconduct charges. One or the other of the confidential informants was responsible for planning the events that led up to each of the incidents. Similarly, in each of the incidents, one or the other of the confidential informants invited the alleged victims to go out with the group of cadets. It was also one or both of the confidential informants that left an inebriated female alone with an intoxicated Claxton before each alleged offense. While this "set up" defense was certainly not a "slam dunk," it may have been the best defense available to Claxton – had he known it was available. *See Collier*, 67 M.J. at 356.

The nondisclosure in this case also clearly hampered a strategic option and the defense's ability to prepare and present its case. *Stellato*, 74 M.J. at 490. During the findings arguments, trial counsel emphasized the credibility

of one of the confidential informants by arguing that he resisted believing that his friend, Claxton, could commit such offenses, but was ultimately swayed by the strength of the evidence to believe the allegations were true. He argued to the panel, "More and more they become to be convinced, as you are convinced, that [the victim] is telling the truth." Trial counsel also argued that one of the confidential informants himself was credible because "[he] received pretty significant punishment for underage drinking inside the dorms. This immunity doesn't make [his] punishments go away. . . . It allows [him] to make sure [he] tell[s] the truth." However, that informant testified at the *DuBay* hearing that, despite his statements to the contrary during the court-martial, he believed the punishments would go away and that he would not be disenrolled from the Air Force Academy because the infractions were accrued during his duties as a confidential informant.

Despite the government knowing that two of the witnesses were confidential informants, it deceptively leveraged the defense and the panel's ignorance of the informants' status to bolster the credibility of the victims and witnesses. This information hampered Claxton's ability to prepare and present his case and, had it been disclosed, would have allowed the defense to rebut the government's arguments more effectively. *Stellato*, 74 M.J. at 490.

Due to the nondisclosure, the defense was denied the ability to pursue a strategic option and present their best defense. We have no way of knowing what the effect would have been on the members had they been informed that two principal government witnesses, who had been involved in all the incidents, were government agents. Certainly it would have had some effect on their consideration of the government's case. Had this nondisclosure been discovered at trial, the military judge would have had a variety of remedies available but, at the very least, the defense would have been given sufficient time to re-craft its defense strategy. *See id.* ("Prejudice can arise from discovery violations when those violations interfere with an accused's ability to mount a defense."). Remanding this case for a new trial would simply achieve that same result.

As there is sufficient evidence in the record to show that the government's flagrant *Brady* violation might have affected the outcome of the court-martial, the non-disclosure was not harmless beyond a reasonable doubt. I would reverse the Air Force Court of Criminal Appeals and remand the case for a new trial.