# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

### No. ACM S32634

———————————

### UNITED STATES
*Appellee*

**v.**

### Ngange D. BAH
Airman (E-2), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 9 July 2021

———————————

*Military Judge:* Bryan D. Watson.

*Sentence:* Sentence adjudged 29 August 2019 by SpCM convened at Royal Air Force Mildenhall, United Kingdom. Sentence entered by military judge on 19 September 2019: Bad-conduct discharge, confinement for 6 months, reduction to E-1, and a reprimand.

*For Appellant:* Major Benjamin H. DeYoung, USAF.

*For Appellee:* Lieutenant Colonel Brian C. Mason, USAF; Lieutenant Colonel Matthew J. Neil, USAF; Captain Cortland T. Bobczynski, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, LEWIS, and CADOTTE, *Appellate Military Judges*.

Chief Judge JOHNSON delivered the opinion of the court, in which Senior Judge LEWIS and Judge CADOTTE joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

JOHNSON, Chief Judge:

A special court-martial composed of a military judge alone found Appellant guilty, in accordance with his pleas, of one specification of absence without

leave and one specification of making a false official statement in violation of Articles 86 and 107, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 886, 907, respectively. Contrary to Appellant's pleas, the military judge found him guilty of one specification of assault consummated by a battery in violation of Article 128, UCMJ, 10 U.S.C. § 928 (*Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*)).[1,2] The military judge sentenced Appellant to a bad-conduct discharge, confinement for six months, reduction to the grade of E-1, and a reprimand. The convening authority took no action on the findings or sentence, but provided language for the adjudged reprimand.[3] The military judge signed an entry of judgment reflecting the adjudged findings and sentence, including the reprimand language.

Appellant raises two issues for our review on appeal: (1) whether the evidence was legally and factually sufficient to support his conviction for assault consummated by battery; and (2) whether the military judge erred in denying the Defense's motion to dismiss the charge and specification of assault consummated by battery due to a discovery violation.[4] We find no error materially prejudicial to Appellant's substantial rights, and we affirm the findings and sentence.

## I. BACKGROUND

In November 2018, Appellant was a 21-year-old Airman stationed at Royal Air Force (RAF) Mildenhall, United Kingdom. On the night of 24–25 November 2018, Appellant and three other male Airmen traveled to a nightclub in Cambridge, United Kingdom, where they got into an altercation with several British citizens, including RM, which led to Appellant's conviction for assault consummated by a battery against RM. The details of the incident were and are the subject of considerable dispute at trial and on appeal, and the evidence

---

[1] References to Article 128, UCMJ, are to the *Manual for Courts-Martial, United States* (2016 ed.). Unless otherwise specified, all other references to the UCMJ and the Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] The military judge found Appellant not guilty of two specifications of violating a lawful order in violation of Article 92, UCMJ, 10 U.S.C. § 892.

[3] The earliest offense date was on or about 25 November 2018; however, the charges were preferred on 7 June 2019, and no criminal action was initiated prior to 1 January 2019. Accordingly, the convening authority was not required to take action on the sentence. *See United States v. Brubaker-Escobar*, ___ M.J. ___, No. 20-0345, 2021 CAAF LEXIS 508, at *9 (C.A.A.F. 4 Jun. 2021).

[4] Appellant personally raises issue (2) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

regarding this offense is described in detail below. Initially, British police investigated the incident, but when British authorities declined to prosecute the matter, the Air Force continued with the investigation and prosecution.

On 12 March 2019, Appellant did not report to his place of duty on time. Instead, he called his supervisor and told him that Security Forces investigators "told [him] to come in" to their office, or words to that effect, which was untrue. As a result of this incident, Appellant was charged and pleaded guilty to one specification of absenting himself from his place of duty and one specification of making a false official statement.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Additional Background

Appellant challenges the legal and factual sufficiency of his conviction for striking RM on the body and head with his hand and kicking RM on the body and head with his foot. Therefore, we describe in some detail the relevant evidence, as well as the military judge's special findings with regard to assault consummated by battery.

##### a. The Video

At trial, the Government introduced video recorded by a camera from across the intersection from where the altercation took place. The figures depicted in the video are blurry and indistinct. The Defense introduced a shorter portion of the same video that had been slowed to half-speed and digitally enhanced by the Defense's expert in digital forensics, Mr. KP. However, even the enhanced defense exhibit is not very clear. Nevertheless, Appellant is visible in the video and, based on witness testimony and other photographic evidence, identifiable from his gray jacket and light-colored boots. The video appears to depict the following sequence of events.

The victim, RM, and his companions are walking away from the club on a sidewalk near an intersection. Appellant and the other Airmen follow and overtake RM, moving up from behind on either side of him. Appellant, who is to RM's right, appears to initiate the assault by lunging at RM and appears to strike at RM's head with his hand, at which point several figures converge into an indistinct mass. In the ensuing scuffle, one of RM's female companions pushes Appellant away from the group and toward a nearby parked van. Appellant moves away, but the scuffling group of people follows in the same direction, and three figures fall to the ground in a pile in front of Appellant: RM, RM's friend DB, and one of the Airmen, Senior Airman (SrA) DG.

SrA DG quickly regains his feet. As he does so, one of the other Airmen, Airman (Amn) TB, swings his arm up and down in an overhead motion as if lashing someone on the ground with an object of some sort. The view of the individuals on the ground is partially obstructed and it is very difficult to discern a particular target, but another Airman, Amn MO, appears to be directing blows with his hands and foot at the same target as Amn TB. In addition, Appellant appears to strike at targets on the ground with two punches and two kicks.

As Appellant is throwing his last punch and last kick, RM's friend DB climbs to his feet and scrambles away from the Airmen. After DB moves away, Appellant withdraws a short distance, although still in the frame of the camera. As RM is still lying on the ground, Appellant and the other Airmen are confronted by and turn their attention to RM's other companions. However, Appellant is not depicted delivering any further punches or kicks. RM is helped to his feet and thereafter does not receive any more blows.

### b. RM's Testimony

RM testified that he was at the club that night with his male friend DB and two female acquaintances celebrating a birthday. At one point, RM was outside smoking when he observed "several young Americans," one of whom called one of his female companions "derogatory terms." This prompted RM to approach the men and tell them not to speak that way. RM and his friend then went back inside the club.

According to RM, his group left the club and were on their way to a restaurant because DB was hungry. RM had several alcoholic drinks over the course of the evening, but testified that at the point he left the club he was "okay" and did not have trouble with his "physical faculties" or "seeing things." However, his memory of subsequent events was poor.

RM testified that as he was walking, in his peripheral vision he saw "one of the guys from the altercation" wearing a "white jacket and a white cap . . . swinging something in his hand."[5] RM continued walking, but was then "bludgeoned on the top of [his] head." RM testified he believed he was hit on top of the head with a belt buckle or other object. According to RM, his assailants then pulled the hood of his coat over his head and "put [him] down on the floor [sic] and started kicking and punching him in the head and ribs." RM testified that after that point he "can't remember a lot of other stuff," and believed he "must have gone unconscious" twice. RM testified that he was unarmed that night, that he did not threaten or harm any of the Americans prior to being

---

[5] Appellant was not wearing a white cap or jacket during the incident.

attacked, and that he did not recall throwing any punches or kicking anyone once he was on the ground.

On cross-examination, RM testified that Appellant had been the individual wearing the white jacket and baseball cap on the night of the incident. On re-direct examination, RM testified that the individual wearing the white jacket and baseball cap had been the one who insulted his female friend outside the club.

### c. Bystander Testimony

LM was a British civilian who was part of a group that happened to be walking nearby when the incident occurred. LM testified she heard a shout behind her and turned around. Although she did not see how the incident started, she saw RM "was hit and went down on the ground." LM testified RM "was being kicked in the head, and he was being punched in the stomach as well by a group of people. It seemed to be a very kind of one-sided fight." LM did not see anyone other than RM kicked in the head during the fight. LM, who had some medical training, went to assist RM after he was able to stand up. She observed RM had a laceration on his head which was "bleeding significantly" and he was "obviously in shock." After she helped him sit down by a building, LM observed RM become unconscious for at least 30 seconds. Even when RM regained consciousness, he was "quite groggy." On cross-examination, LM stated that RM was struck by multiple people and the blows "definitely landed."

PS was another British civilian who was with LM that night. PS testified that as they were walking, a group of people walked past them. Then he saw another group "come from behind" the first group and "jump[ ] one of the people who just walked past us;" they "just started attacking him" without "any preamble." PS testified he did not "have many clear memories of who was doing what" in what seemed to be "a general fight for a while." However, "eventually" he "saw one person being taken to the ground and [PS's] clearest memory is one person was standing over [the person on the ground], and he had something in his hand, and he was striking overarm down onto the person who was on the ground." PS testified he later saw the object was a belt.

### d. SrA DG's Testimony

SrA DG testified as a prosecution witness. According to SrA DG, he observed Amn TB arguing with a British man in the smoking area outside the club. During this argument, the British man swung at Amn TB with an open hand, although SrA DG could not tell if the man struck Amn TB or not. The club's security guards intervened to end that altercation, and the guards escorted the Airmen out of the club. SrA DG acknowledged he was present at the later altercation with RM, which he described as a "scuffle." Trial counsel

played the CCTV video during SrA DG's testimony and had SrA DG identify himself, Amn TB, and Appellant in the video. With regard to SrA DG's own role in the incident, he acknowledged that he was "somewhere in the middle of it," but was "kind of trying to move people away" before he fell down at one point, and that he ran away when the police arrived.

### e. Police Officer Testimony

Two British police officers testified at Appellant's trial. Police Constable (PC) PL testified that when he arrived at the scene of the incident, he saw RM lying unconscious and bleeding from the head and being assisted by LM. Later that night, PC PL arrested Appellant at a location approximately 80 to 100 meters away from the scene of the incident based on an identification from the CCTV video. Through PC PL, the Government introduced photographs depicting the clothing Appellant wore that night, including a gray jacket and light-colored boots but not a white cap or jacket.

PC PK testified that he arrested Amn TB approximately 50 yards from the scene of the incident, also based on an identification from the video. Through PC PK, the Government introduced photographs depicting the clothing Amn TB wore that night. The other two Airmen present at the incident, SrA DG and Amn MO, were not arrested by police.

### f. Stipulation of Expected Testimony

At trial, a stipulation of expected testimony of Detective Constable CH was read into the record. *Inter alia*, the stipulation indicated that after the police arrested Appellant they took swabs from his hands. At that time, one constable noted Appellant had blood on his hands and knuckles. The stipulation did not describe the amount of blood on Appellant's hands, nor was there an indication that the police photographed Appellant's hands. Neither the swabs nor Appellant's clothing were tested for DNA evidence due to "limited department resources," which were reserved for more serious offenses.

### g. Military Judge's Special Findings

After both parties rested but before argument on findings, the Government asked the military judge to consider Appellant's potential guilt as a principal pursuant to Article 77, UCMJ, 10 U.S.C. § 877 (2016 *MCM*). The military judge asked if the Defense wished to be heard on that point; trial defense counsel responded that the Defense did not and could "address any argument about aiding and abetting on arguments." After findings arguments, the military judge invited the parties to readdress the applicability of Article 77, UCMJ. At that point, the Defense objected to lack of notice from the Government of the theory that Appellant was guilty by aiding and abetting assaults committed by the other Airmen; however, trial defense counsel conceded the Defense could not identify any specific notice requirement for Article 77, UCMJ, applicability.

After receiving the parties' arguments, the military judge stated he would "consider any applicable theories of vicarious liability that [he] may see in this case."

The military judge found Appellant guilty of the charged assault consummated by battery of RM. At the Defense's request, the military judge made written special findings. In pertinent part, the military judge found Appellant did bodily harm to RM by "personally striking [RM] in the body and head with his hand, and by kicking [RM] in the body and head with his foot." In addition, the military judge found Appellant "aided and abetted the commission by others of the acts in Charge I and its Specification" by striking RM, which "aided, encouraged, and incited" Amn TB and Amn MO to also assault RM. Furthermore, the military judge found "the actions and conduct of the parties" indicated Appellant "conspired with [the] others to commit assault" on RM, and while that agreement continued to exist Amn TB and Amn MO "committed overt acts, including unlawfully striking [RM's] body with their own body parts, and with a belt . . . for the purpose of bringing about the object of the agreement."

### 2. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citation omitted), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). Thus, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,'

applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

In order to convict Appellant of the charged offense of assault consummated by a battery in violation of Article 128, UCMJ, the Government was required to prove: (1) that Appellant did bodily harm to RM; and (2) that the bodily harm was done with unlawful force or violence. *See* 2016 *MCM*, pt. IV, ¶ 54.b.(2).

Article 77, UCMJ, provides that any person subject to the UCMJ who "commits an offense punishable by this chapter, or aids, abets, counsels, commands, or procures its commission," is a principal and is guilty of the offense. 10 U.S.C. § 877 (2016 *MCM*). "A principal under an aiding and abetting theory is independently guilty of an offense even though he or she is not the actual perpetrator and did not personally commit all of the acts necessary for the offense." *United States v. Simpson*, 81 M.J. 33, 36 (C.A.A.F. 2021); *cf.* R.C.M. 307(c)(3), Discussion ("All principals are charged as if each was the perpetrator.").

> If one is not a perpetrator, to be guilty of an offense committed by the perpetrator, the person must: (i) Assist, encourage, advise, instigate, counsel, command, or procure another to commit, or assist, encourage, advise, counsel, or command another in the commission of the offense; and (ii) Share in the criminal purpose or design.

2016 *MCM*, pt. IV, ¶ 1.b.(2)(b). "[A]iding and abetting requires proof of the following: '(1) the specific intent to facilitate the commission of a crime by another; (2) guilty knowledge on the part of the accused; (3) that an offense was being committed by someone; and (4) that the accused assisted or participated in the commission of the offense.'" *United States v. Mitchell*, 66 M.J. 176, 178 (C.A.A.F. 2008) (quoting *United States v. Pritchett*, 31 M.J. 213, 217 (C.M.A. 1990)) (additional citation omitted).

### 3. Analysis

The specification of which Appellant was found guilty alleged that Appellant did "unlawfully strike [RM] in the body and head with his hand and unlawfully kick [RM] in the body and head with his foot." Appellant acknowledges the video depicts him throwing two punches and kicking twice in the direction of someone on the ground. However, he contends the evidence indicates he was striking at DB, who he asserts was closer to him than RM was, and that the evidence does not prove any of his blows actually landed. With regard to his vicarious liability for the blows Amn TB and Amn MO inflicted on RM, Appellant counters with three arguments. First, he argues that, contrary to the military judge's findings, there was no evidence of any agreement or coordination

between Appellant and anyone else to assault RM. Second, he contends that, because the evidence does not prove that Appellant actually struck RM, the military judge's finding that Appellant's blows to RM "aided, encouraged, and incited" Amn TB and Amn MO to also strike RM is similarly unsupported. Third, Appellant reiterates trial defense counsel's argument that alternative theories of liability under Article 77, UCMJ, were not available to the Government because the Defense was not adequately put on notice of those theories.

We find Appellant's conviction for assault consummated by battery legally and factually sufficient through a combination of evidence that Appellant was the actual perpetrator of the offense, and evidence that Appellant aided and abetted others in committing the offense.

### a. Appellant as Actual Perpetrator

The military judge found Appellant was guilty of the entire specification as the actual perpetrator. Certainly, there is significant evidence that Appellant personally struck RM. For example, the evidence indicates that RM himself, rather than DB or RM's other companions, was the particular focus of the Airmen's attack. In addition, the evidence indicates RM was actually being struck during the assault. Furthermore, the stipulation of expected testimony indicated Appellant had blood on his hands after the police arrested him; RM was bleeding profusely from his head, and there was no evidence anyone else was bleeding during the incident.

However, we acknowledge there are weak points in the Government's proof of Appellant's guilt of striking RM in the head *and* body with both his hand *and* foot, *as the actual perpetrator*. The quality of the videos introduced by both the Prosecution and Defense was poor, and it is difficult to discern in the video where Appellant's punches and kicks landed. RM's own testimony, perhaps due to his poor memory, is particularly unhelpful in this regard, and his identification of Appellant as the individual wearing a white cap and jacket simply does not match the other evidence.

Accordingly, we do not rest our conclusion that the evidence is legally and factually sufficient upon evidence that Appellant was the actual perpetrator of the charged assault consummated by battery. Instead, considering the entirety of the evidence, it is Appellant's liability as a principal under Article 77, UCMJ, that cements his guilt.

### b. Appellant's Liability as Principal for Aiding and Abetting

We find Appellant's liability for aiding and abetting Amn MO in unlawfully striking RM pursuant to Article 77, UCMJ, in conjunction with the evidence of the assaults Appellant personally committed, would enable a rational fact-

finder to find Appellant guilty of the entire specification as charged. We consider each of the four requirements for culpability by aiding and abetting in turn. *See Mitchell*, 66 M.J. at 178 (citation omitted).

First, although we acknowledge the absence of direct evidence of Appellant's specific intent to facilitate the physical assault of RM, there was strong circumstantial evidence Appellant had such intent. *See United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019), *cert. denied*, __ U.S. __, 139 S. Ct. 1641 (2019) (citations omitted) ("[T]he [G]overnment is free to meet its burden of proof with circumstantial evidence . . . ."). The video in particular depicts Appellant and the other Airmen close in on RM from behind on both sides in a coordinated manner. Appellant appears to initiate the assault by lunging and striking at RM, and the other Airmen immediately join in. Although Appellant is then pushed away from the melee by one of RM's female companions, he subsequently joins in again striking at RM who is lying essentially defenseless on the ground. Appellant, Amn TB, and Amn MO surround RM while they strike him.

Second, the evidence supports that Appellant had "guilty knowledge" of the charged assault consummated by battery of RM. *Mitchell*, 66 M.J. at 178 (citations omitted). Appellant himself initiated the action by striking at RM, and then joined Amn TB and Amn MO in striking at RM as he lay on the ground.

Third, the evidence supports that RM was unlawfully struck in the head and body by hands and feet. Although the video depicts Amn TB specifically striking with a belt, which was not charged, it also depicts Amn MO striking at a target on the ground multiple times with his hands and feet. RM's testimony indicated he felt blows to his head and body as he lay on the ground, and LM saw RM "being kicked in the head" and "punched in the stomach" by a "group of people." Considering the evidence as a whole, we are convinced beyond a reasonable doubt that in the course of the incident, between them, Appellant and Amn MO struck RM in both the head and body with their hands and feet.

Fourth, we find Appellant "assisted or participated" in Amn MO's commission of the offense. Again, Appellant appears to have initiated the assault on RM by striking at him from the side and without warning. A reasonable factfinder could conclude this assault signaled or encouraged the other Airmen to begin their own attacks, and assisted those attacks by disorienting and perhaps injuring RM. In addition, Appellant apparently struck at RM as he lay on the ground, and a rational factfinder could conclude Appellant thereby encouraged the other Airmen to continue their attacks and facilitated those attacks by keeping RM on the ground and vulnerable to further blows.

We are not persuaded by Appellant's argument that the Defense received inadequate notice of his potential culpability for aiding and abetting the other Airmen. The "purpose" of Article 77, UCMJ, is "to make clear that a person need not personally perform the acts necessary to constitute an offense to be guilty of it." 2016 *MCM*, pt. IV, ¶ 1.b.(1). Neither the article itself nor the *Manual for Courts-Martial* contains such a notice requirement. *Cf. United States v. Browning*, 54 M.J. 1, 8 (C.A.A.F. 2000) ("[T]he military judge did not err by permitting the Government to prove some of the offenses on a theory of vicarious liability, even though a conspiracy was not specifically alleged on the charge sheet."). Appellant cites several cases for the principle that an accused is entitled to notice of the offense which he must defend against. *See, e.g., United States v. Wilkins*, 71 M.J. 410, 413–14 (C.A.A.F. 2012); *United States v. Jones*, 68 M.J. 465, 468 (C.A.A.F. 2010). However, Appellant's case is fundamentally unlike those cases. Unlike *Wilkins*, the specification in the instant case did not fail to state an offense; unlike *Jones*, Appellant was not erroneously convicted of a purported lesser included offense. Appellant was convicted of exactly the offense he was charged with; implicitly, under Article 77, UCMJ, Appellant would be guilty not only if he were the actual perpetrator, but also if he aided or abetted an actual perpetrator who committed the charged offense, provided the requisite elements of principal liability for aiding and abetting are proven beyond a reasonable doubt. *See Mitchell*, 66 M.J. at 178 (citations omitted).

### c. Conclusion as to Legal and Factual Sufficiency

Drawing every reasonable inference from the evidence of record in favor of the Government, we conclude the evidence was legally sufficient to support Appellant's conviction for assault consummated by a battery beyond a reasonable doubt. Additionally, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt.

## B. Discovery

### 1. Additional Background

The Defense called Appellant's supervisor, Master Sergeant (MSgt) CC, as a sentencing witness. During a brief direct examination MSgt CC testified Appellant had been a good worker. On cross-examination, trial counsel elicited that MSgt CC was aware of the charged assault, that Appellant had spoken with MSgt CC about the incident, that MSgt CC had subsequently reviewed the CCTV video of the incident, and that Appellant had lied to MSgt CC about what had happened.

At that point, the Defense objected to MSgt CC's testimony that Appellant had lied to him, on the basis that the Government had not provided notice of

such a statement by Appellant as required by Mil. R. Evid. 304(d). As the military judge discussed the objection with counsel, the Government proffered that when trial counsel interviewed MSgt CC a few days before trial, MSgt CC indicated Appellant had told him "something to the effect" that the altercation with RM "happened in the heat of the moment, and it was a fast-moving situation related to what had happened inside the club." The military judge sustained the defense objection and did not consider MSgt CC's testimony regarding whether Appellant had lied to him about the incident.

Following a short recess, the Defense further argued that the nondisclosure of Appellant's statement to MSgt CC violated Appellant's due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), because Appellant's statement as to how the fight started was exculpatory. The military judge granted an additional recess in order for counsel to interview MSgt CC regarding this issue and for the Defense to research "appropriate remedies." When the court-martial resumed, the Defense moved for dismissal without prejudice of the charge and specification of assault consummated by battery based on, *inter alia*, *Brady* and R.C.M. 701(a)(6).

MSgt CC testified for purposes of the motion and provided the following description of Appellant's statements regarding the fight:

> There was an argument in the club. It was [Appellant], [Amn TB] at the time, and they got into an argument with somebody, and I'm not sure who it was or whoever the British counterpart was they were arguing with. I'm not sure what it was about. The British person used a racial slur, called him the N word in the club. From at [sic] some point it escalated. Someone sucker punched [Appellant] in the face. And then obviously it escalated from there and it [sic] continued to fight from that point.

MSgt CC further testified that when he spoke with trial defense counsel the week prior to trial, they did not ask him whether Appellant had made any statements about the alleged assault. However, when trial counsel interviewed him after the Defense spoke with him, MSgt CC did provide information about Appellant's statement. After MSgt CC disclosed Appellant's statement, trial counsel informed MSgt CC that he could watch the CCTV video if he desired. MSgt CC did so, and testified that what he saw on the video "was not what [he] was [ ] told happened," and acknowledged he was "stunned" by the video.

For purposes of the motion, at the Government's request the military judge agreed to consider the contents of Appellant's interview by British police shortly after his arrest. During the course of the interview, Appellant made several false statements denying or minimizing his role in the assault on RM, including *inter alia* that Appellant had merely attempted to pull his friends

away from the fight and leave the area, that he did not know the names of anyone who had kicked anyone on the ground, that he had not assaulted anyone, and, after being shown the security video, admitted he had thrown punches and kicked but denied that he had made contact, or words to that effect.

After hearing additional argument from counsel, the military judge denied the Defense's motion to dismiss or, in the alternative, to declare a mistrial. The military judge ruled there had been no due process violation because Appellant's statements to MSgt CC about the assault were not "favorable" to the accused as the Supreme Court used that term in *Brady*. The military judge agreed with the Government that, "viewed in concert with the other evidence," Appellant's statement to MSgt CC was a false exculpatory statement and "actually evidence of [Appellant's] guilt." The military judge further found the statement was "not capable of impeaching the Government's case," as it would only be admissible by the Defense under "narrow circumstances," and the Defense's argument that it would have changed its findings case had the statement been disclosed was speculative and "improbable." For similar reasons, the military judge found the statement was also not material. Furthermore, the military judge explained that "if an Accused knows or should know the 'essential facts' permitting him to take advantage of any exculpatory evidence, no *Brady* violation occurs," citing *United States v. Grossman*, 843 F.2d 78 (2d Cir. 1988). In this case, the military judge ruled, "the Defense should have known the full nature of their own witness'[s] testimony."

### 2. Law

We review a military judge's discovery rulings, including remedies for discovery violations, for an abuse of discretion. *United States v. Stellato*, 74 M.J. 473, 480 (C.A.A.F. 2015); *see also United States v. Coleman*, 72 M.J. 184, 186 (C.A.A.F 2013) ("We will not reverse a military judge's determination on a mistrial absent clear evidence of an abuse of discretion.") (citation omitted).

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. "Under *Brady*, evidence is material if there is a 'reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.'" *Smith v. Cain*, 565 U.S. 73, 73 (2012) (quoting *Cone v. Bell*, 556 U.S. 449, 469–70 (2009)). The United States Supreme Court has extended *Brady*, clarifying "that the duty to disclose such evidence is applicable even though there has been no request by the accused . . . and that the duty encompasses impeachment evidence as well as exculpatory evidence." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citations omitted); *see also United States v. Claxton*, 76 M.J. 356, 359 (C.A.A.F. 2017).

"A military accused also has the right to obtain favorable evidence under Article 46, UCMJ, . . . as implemented by R.C.M. 701–703." *Coleman*, 72 M.J. at 186–87 (footnotes omitted). Article 46, UCMJ, and these implementing rules provide a military accused statutory discovery rights greater than those afforded by the United States Constitution. *See id.* at 187 (citing *United States v. Roberts*, 59 M.J. 323, 327 (C.A.A.F. 2004)) (additional citation omitted). R.C.M. 701(a)(6) provides that trial counsel "shall, as soon as practicable, disclose to the defense the existence of evidence known to trial counsel which reasonably tends to [ ] (A) Negate the guilt of the accused for an offense charged; (B) Reduce the degree of guilt of the accused of an offense charged; [or] (C) Reduce the punishment . . . ."

"Before arraignment, the prosecution must disclose to the defense the contents of all statements, oral or written, made by the accused that are relevant to the case, known to trial counsel, and within the control of the Armed Forces, . . . that the prosecution intends to offer against the accused." Mil. R. Evid. 304(d).

"[A]n appellate court may resolve a discovery issue without determining whether there has been a discovery violation if the court concludes that the alleged error would not have been prejudicial." *United States v. Santos*, 59 M.J. 317, 321 (C.A.A.F. 2004). "A constitutional error is harmless when it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict." *United States v. Chisum*, 77 M.J. 176, 179 (C.A.A.F. 2018) (quoting *Mitchell v. Esparza*, 540 U.S. 12, 17–18 (2003)) (additional citation omitted).

### 3. Analysis

Appellant contends the Government's failure to disclose MSgt CC's statement regarding what Appellant said about the incident violated his due process rights under *Brady*, and the military judge erred by denying the Defense's motion to dismiss. In response, the Government essentially indorses the military judge's conclusions that Appellant's statement to MSgt CC was not exculpatory because it was false, and that the Defense should have discovered it in any event because MSgt CC was the Defense's own witness.

We decline to resolve this issue through a determination of whether or not this facially exculpatory statement in fact had exculpatory value under any circumstances. Instead, assuming for purposes of our analysis that the Government was required to disclose it to the Defense, we conclude its nondisclosure did not affect the verdict and was harmless beyond a reasonable doubt. Disclosure of the statement would have had no material effect on the most probative evidence of the charged assault and battery, specifically the CCTV

video, witness testimony, and blood on Appellant's hands. The most likely explanation for Appellant's statement to MSgt CC is the conclusion drawn by the military judge and MSgt CC himself, that Appellant made a false exculpatory statement which tended to evince consciousness of guilt in light of the other evidence. Obviously, this conclusion is not favorable to the Defense. Even if a factfinder entertained less deceitful interpretations of Appellant's statement—for example, that Appellant inaccurately recalled the events, or that he was describing events that occurred at a different point in time, or which could not be discerned in the video—his uncorroborated assertions would not have countered the Government's evidence. Finally, Appellant's statement denying culpability for the charged assault and battery would have been of no material value in the context of sentencing for that very offense.

Accordingly, we find Appellant is not entitled to relief.

## III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59 and 66(d), UCMJ, 10 U.S.C. §§ 859, 866(d). Accordingly, the findings and sentence are **AFFIRMED**.[6]

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court

---

[6] We note the post-trial documents signed by the military judge contain two errors, one of which requires correction. The Statement of Trial Results failed to include the command that convened the court-martial as required by R.C.M. 1101(a)(3). Appellant has not claimed prejudice from this error and we find none. *See United States v. Moody-Neukom*, No. ACM S32594, 2019 CCA LEXIS 521, at *2–3 (A.F. Ct. Crim. App. 16 Dec. 2019) (per curiam) (unpub. op.). However, the entry of judgment contains an error with regard to Specification 2 of Charge IV, where the officer who allegedly issued a lawful order to Appellant is misidentified (the officer is correctly identified on the charge sheet and Statement of Trial Results). The Chief Trial Judge, Air Force Trial Judiciary, is directed to have a detailed military judge correct the entry of judgment accordingly and prior to completion of the final order under R.C.M. 1209(b) and Air Force Instruction 51-201, *Administration of Military Justice*, Section 14J (18 Jan. 2019, as amended by AFGM 2020-02, 5 Oct. 2020).