# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

———————————

**No. ACM 39911**

———————————

**UNITED STATES**
*Appellee*

**v.**

**Johnny H. JOHNSON**
Senior Airman (E-4), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 10 February 2022

———————————

*Military Judge:* Matthew P. Stoffel (motions); James R. Dorman.

*Sentence:* Sentence adjudged 31 January 2020 by GCM convened at Kadena Air Base, Japan. Sentence entered by military judge on 14 February 2020: Dishonorable discharge, confinement for 42 months, reduction to E-1, total forfeitures, and a reprimand.

*For Appellant:* Major Amanda E. Dermady, USAF; Major Sara J. Hickmon, USAF.

*For Appellee:* Lieutenant Colonel Matthew J. Neil, USAF; Major Alex B. Coberly, USAF; Mary Ellen Payne, Esquire.

Before POSCH, RICHARDSON, and CADOTTE, *Appellate Military Judges*.

Judge CADOTTE delivered the opinion of the court, in which Senior Judge POSCH and Judge RICHARDSON joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

CADOTTE, Judge:

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification of attempted sexual assault of a child and one specification of attempted sexual abuse of a child, in violation of Article 80, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 880.[1] The court members sentenced Appellant to a dishonorable discharge, confinement for 42 months, reduction to the grade of E-1, forfeiture of all pay and allowances,[2] and a reprimand. The convening authority took no action on the adjudged sentence.

Appellant raises five issues on appeal: (1) whether Appellant's convictions are legally and factually insufficient because he was entrapped; (2) whether the military judge abused his discretion by improperly admitting evidence that Appellant was a member of an online "teenager" chat group; (3) whether the military judge erred by denying the Defense's motion to compel discovery; (4) whether Appellant's sentence is inappropriately severe on grounds that the sentence of confinement is excessive compared to closely related cases; and (5) whether Appellant was deprived of his right to a unanimous verdict as guaranteed by the Sixth Amendment,[3] the Fifth Amendment's Due Process Clause,[4] and the Fifth Amendment's right to equal protection.[5,6] During our Article 66(d), UCMJ, 10 U.S.C. § 866(d), review, we also consider the issue of timely appellate review.

We have carefully considered issues (4) and (5), and find they do not require further discussion or warrant relief. *United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). As to the remaining issues, we find no error that materially prejudiced Appellant's substantial rights, and we affirm the findings and sentence.

## I. BACKGROUND

---

[1] Unless otherwise noted, all references in this opinion to the UCMJ, Rules for Courts-Martial (R.C.M.), and Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] The Statement of Trial Results (STR) and the entry of judgment (EoJ) describe this part of the sentence as "Forfeitures of Pay and/or Allowances: Total." Appellant claims no prejudice from this irregularity and we find none.

[3] U.S. CONST. amend. VI.

[4] U.S. CONST. amend. V.

[5] *Id.*

[6] Appellant personally asserts issues (4) and (5) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). We granted Appellant's motion for leave to file issue (5) as a supplemental assignment of error.

Appellant, a member of the Louisiana Air National Guard, was ordered to active duty at Kadena Air Base, Okinawa, Japan. On 14 June 2019, approximately three months after his arrival to the base, he initiated online communications with a person identified as "DJ." "DJ" posted a message on the Internet application Whisper that stated, "Just moved here with my parents Any recommendations on things to do." Unbeknownst to Appellant, "DJ" was actually Navy Criminal Investigative Service (NCIS) Special Agent (SA) GH. SA GH was posing as a young girl as part of an undercover law enforcement operation designed to catch sexual predators targeting children authorized under the Tsunami Roll operational plan. Appellant responded to the message by sending "DJ" a message noting that it would depend on her age. "DJ" responded by stating that she was 13 years old. Despite being 30 years old, Appellant continued to message "DJ." Their electronic communications continued for approximately two weeks, during which time Appellant used a variety of graphic terms and explicit language to describe the sexual acts he wanted to perform on "DJ" and have her perform on him. Appellant included in his messages graphic descriptions of how he wanted to, and would, engage in oral sexual intercourse with "DJ."

On 29 June 2019, Appellant arranged to meet "DJ" at a location on Camp Foster, Okinawa, Japan. Appellant then drove to the location where he was apprehended by law enforcement. At the time of his apprehension, Appellant admitted his plan was to pick up "DJ," and then take her to the mall, watch a movie, have her kiss him, and have her perform oral sex on him.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant asserts that the evidence for the two offenses of which he was convicted was legally and factually insufficient to overcome the defense of entrapment raised at trial. Appellant claims that the suggestion and initiative to commit the offenses originated with the Government, and that he was not predisposed to commit the offenses. We are not persuaded that Appellant was entrapped and find his convictions both legally and factually sufficient.

#### 1. Additional Background

As noted, Appellant responded to the Whisper post by "DJ," and was immediately told by "DJ" that she was a 13-year-old girl. Appellant also told "DJ" early in their communications that he was 30 years old. Initially, the text conversations between Appellant and "DJ" covered general topics. Although Ap-

pellant and "DJ" exchanged photographs of each other, Appellant never requested, sent, or received "lewd photos." Eventually, however, Appellant guided the Whisper conversation to sexual matters in the following exchange:[7]

> [Appellant]: What IS the weirdest think [sic] you've seen on here?

> ["DJ"]: Well what I find weird others may not. I think it is weird when people just post things that are impossible to reply to like "just caught my husband cheating" or "I hate hating myself". Just seems weird to me.

> [Appellant]: Mabey they want to vent, or maybe they want it to be the opposite and have it turned sexual

> ["DJ"]: Well that is a weird way of starting a sexual convo

> [Appellant]: True, but people have some… very different fetishes.

> ["DJ"]: I guess lol

> [Appellant]: Yep.

> [Appellant]: I mean, everyone has their kinks, so I cant kink shame TOO hard.

> ["DJ"]: [laughing emoji] oh yea?

> [Appellant]: Yep, I'm sure you have yours. Haha

> ["DJ"]: Of course

> [Appellant]: Wanna share? Muhaha

> ["DJ"]: I first

> ["DJ"]: U first

> [Appellant]: One for one?

> ["DJ"]: Deal

> [Appellant]: . . . I'm a dom.

> ["DJ"]: What's that

> [Appellant]: Dominant.

> ["DJ"]: I mean of course I know what that is [smiley face emoji] but how would you explain it if I didn't

---

[7] Text message exchanges are taken verbatim from evidence introduced at trial and include misspellings and punctuation errors.

["DJ"]: Uh oh. Did I upset u

[Appellant]: Oh.. ok, I see then. Haha Imagine giving your free will and total submission to someone else. Letting them take control over your most intimate pleasures and fulfilling your every sexual desire. But it doesnt stop in the bedroom. You submit to them even outside the bedroom. You are their pet to please them when asked. To make them happy, and in return, they make you feel like you are their entire world. But they are the sun. ;)

[Appellant]: You did not. Just lots to type.

["DJ"]: Oh so like 50 shades

[Appellant]: That is a disgrace to actual doms.

After continued conversation about sexual dominance, Appellant eventually wrote, "Oh it's your turn," thereby turning the focus of the conversation to "DJ." Appellant questioned "DJ" as what her "kink" was, to which "DJ" eventually responded, "Fine. I like porn." The following exchange then took place:

[Appellant]: See. HaHa what kind?

["DJ"]: Regular kind a guess. Guy and girl

[Appellant]: Well like, is is passionate sex or like, rough sex? Role play?

[Appellant]: One guy and one girl? Multiples? Haha

["DJ"]: Neither I guess. Like not passionate but not rough either. Sounds dumb I know but that's the only way I can explain

The conversation between Appellant and "DJ" continued. At one point Appellant informed "DJ" he was going to the Base Exchange for lunch with a "few guys." He told "DJ," "I'd invite you but I don't think theyd be savvy to the age difference." Later in the conversation, Appellant explained he did not use condoms because was "not the most sensitive down there." "DJ" then asked, "How do you make sure you don't get an STD or have a kid." Appellant replied: "I ask them if they have something. And no one has lied, so yeah.. still clean. And I just pull out, or get lucky. Hah." Appellant then began to ask questions about "DJ's" mother's appearance. Eventually, "DJ" asked if the Appellant wanted her to be jealous as a result of the questions about her mother. Appellant replied, "Maybe… And who knows, maybe if your mom likes me I'll be able to go around 'for her' but then take you out to places. ;) hehe[.]" In reference to "DJ's" mother, Appellant later stated, "I'd use her to get closer to you."

Later, the conversations between Appellant and "DJ" focused on meeting in person. Appellant raised the topic of meeting each other, stating, "So are we

doing stuff, or no?" "DJ" responded, "Like what." Appellant replied "Mall? Movies?" Later, the following exchange regarding "the plan" to meet on Monday, 24 June 2019, occurred:

> [Appellant]: Hahah I was thinking maybe mall and movies?
>
> ["DJ"]: Which movie
>
> [Appellant]: After lunch? And I don't care.. I might not watch it, depending on them vibes. ;)
>
> ["DJ"]: Well actually what if we did it tomorrow night when my mom is at her work event?
>
> [Appellant]: How long is her thing?
>
> ["DJ"]: Like 4 hours
>
> [Appellant]: Oh nice. When does it end?
>
> ["DJ"]: I am pretty sure 11:00

Ultimately a meeting did not take place on 24 June 2019, as "DJ" told Appellant she had to go to a "party thing" with her mother. "DJ" later wrote the "the plan" did not have to change, rather, just the date and time, and "DJ" suggested the next day. In response, Appellant suggested, "Let's do a weekend. So it's not rushed." "DJ" agreed. Appellant and "DJ" continued their communications over the following days. At one point, Appellant was discussing his tattoo and explained "DJ" would have to take off his shirt to see it. The conversation evolved until the following exchange occurred:

> [Appellant]: Well you're not gunna take my shirt off in the movies. But I will kiss you there.
>
> ["DJ"]: Ah so where are we when the shirt comes off
>
> [Appellant]: Maybe run my hands along your body there too.. I'm not sure yet.
>
> ["DJ"]: Oooh I like that. Where will you touch
>
> [Appellant]: Where do you want me to touch you?
>
> [Appellant]: Also, you said one more pic.
>
> ["DJ"]: All over
>
> [Appellant]: Anywhere off limits?
>
> ["DJ"]: ["DJ" sent a picture of a woman, purporting to be "DJ." However, this was a picture of an unidentified female law enforcement agent who was 20–22 years old at the time the photo was taken.]

["DJ"]: Only if you make it off limits

[Appellant]: You seriously are so [f**king] cute..

[Appellant]: I want all of it.

Later, on the next day the following exchange occurred:

[Appellant]: Dont fall asleep on my lap..

["DJ"]: What if I do

[Appellant]: Something may poke your face and I cannot control that..

["DJ"]: Oh yea. You have no control or don't want to control?

[Appellant]: Both.

[Appellant]: I couldnt even if I wanted to.

["DJ"]: What should I do when that happens?

[Appellant]: When?

["DJ"]: Something pokes me in the face

. . . .

[Appellant]: Once it's out, just lay back in my lap and let it rest on Your face. You can kiss it and lick it if youd like.

[Appellant]: Maybe even grab it.

["DJ"]: Oooh. I like it. Maybe I should give it a kiss. Would be rude I guess not to.

[Appellant]: Yeah I agree.

[Appellant]: Then what will you do?

["DJ"]: Well are we still in the theater?

[Appellant]: Oh you want to do this there?

["DJ"]: I'm just asking. You are in control [winking face emoji]

Appellant then steered the conversation to what they would do in the car rather than in the theater. During this part of the conversation, the following exchange occurred:

[Appellant]: Have you ever had one in your mouth?

["DJ"]: Yea

["DJ"]: Come on I'm 13 not 8 lol

[Appellant]: Excuses me, ma'am.

[Appellant]: I want you to see how much you can put in your mouth.

["DJ"]: I guess we will have to see. How much do you think I can fit

[Appellant]: Not a lot.

["DJ"]: Puhh lease

[Appellant]: You think you got it like that?

["DJ"]: Dunno but you neither do you. You can't discount me so quickly

[Appellant]: Well, I'm kinda big. How many have you been with?

[Appellant]: How old were they??

["DJ"]: Only two, 14 and 15

["DJ"]: What is big

[Appellant]: How big were they?

["DJ"]: Idk. It wasn't on my mind

["DJ"]: How big are u

[Appellant]: 7.5, and thick

["DJ"]: [mind exploding emoji]

[Appellant]: What?

["DJ"]: Mind blown

[Appellant]: Why? Haha

["DJ"]: It was meant to be a compliment [winking face emoji]

[Appellant]: So, how much you think? [winking face emoji]

["DJ"]: Dunno. Well have to find out I guess

[Appellant]: Mmm yeas we will.

[Appellant]: Just a warning. I may not keep my hands to myself on the ride there.

After a break in communication, later that night, Appellant and "DJ" continued their conversation:

[Appellant]: I'll make you fight for air.

["DJ"]: Oh yea

["DJ"]: How

8

[Appellant]: I'll force myself down your throat.

. . . .

[Appellant]: [winking face emoji] we've got some training to do, Little One.

["DJ"]: Lol, oh yea. What will we learn

[Appellant]: How to swallow a [c**k].

["DJ"]: Mmm.

["DJ"]: When does traing start

[Appellant]: Saturday.

On Thursday, 27 June 2019, Appellant and "DJ" continued their communication. "DJ" requested the "details" of "the plan" for Saturday. The following exchange took place as to the "details:"

[Appellant]: . . . [W]hen I pick you up, I want a supergood kiss(once the coast is clear) then i want you to show me what you know.

["DJ"]: Oh so right away. I like it. I don't know much though

[Appellant]: ok.It's ok. I'll teach you. ;)

["DJ"]: Deal

[Appellant]: Good. If you wear makeup. Bring extra to put it back on before you go home. Cause there will be tears. And gagging.

["DJ"]: Oh yea. Gagging on you or a toy

[Appellant]: Um. Me. You wont see a toy for a bit.

["DJ"]: Oh nice

[Appellant]: I mean, you wont really ever see one. But you'll feel one. ;) How do you feel about anal?

["DJ"]: I have friends that do it but I'm really afraid it would hurt

[Appellant]: Only if rushed. How old are they??

["DJ"]: My age

[Appellant]: Pretty hot. Do you want to try?

["DJ"]: I guess you do

[Appellant]: Well this one is up to you. I mean, I'm gunna play with your *ss, just so you know. But I wont do a lot of you dont want tom

9

On Saturday, 29 June 2019, Appellant explained to "DJ" that he had to purchase a new tablet because the Internet application they were using to communicate was blocked on the other device he used for their prior communications. Afterward, Appellant and "DJ" agreed to meet at approximately 4:30 p.m. later that day, at the Westpac Lodge on Camp Foster, Okinawa, Japan. Appellant described his vehicle to "DJ" and they continued to communicate while he was traveling to the location. After Appellant arrived at the location and parked his vehicle in the parking garage, a group of Provost Marshal's Office (PMO) Marines, Air Force Office of Special Investigations (AFOSI) agents, NCIS agents, and Army soldiers were there waiting for him and apprehended him. At the time, Appellant's phone and tablet were on the passenger seat and the tablet was open to the Whisper application. Law enforcement members then transported Appellant to an NCIS office to question him.

Before questioning Appellant, SA GH advised Appellant of his rights under Article 31(b), UCMJ, 10 U.S.C. § 831(b); Appellant waived those rights and agreed to answer questions. During the interview with SA GH and an AFOSI agent SA RF, Appellant was asked what he was doing at Westpac. In response, Appellant admitted he was there to meet "DJ." Appellant told the agents that he met "DJ" online and that they "were supposed to meet up, go to the mall and watch a movie." Appellant admitted he had "sexual conversation[s]" with "DJ" and that she was 13 or 14 years old. Appellant explained that the plan was to "watch a movie and then maybe do stuff after." Appellant admitted "stuff" included oral sex.

Appellant was questioned by SA GH and SA RF, during which the following exchanges occurred:

> [Appellant]: I don't think it was anyone's plan, per say [sic]. I think the conversation just came and ----
>
> [SA GH]: Just kind of led down-----
>
> [Appellant]: We just kind of ----
>
> [SA GH]: Okay. Well, whose plan was it to do [b*** jobs] in the car?
>
> [Appellant]: I'm not sure if it was hers or mine. It could have been mine.
>
> [SA GH]: Okay. Because there was some chats there -- and I know I told you I wasn't going to bring them up. But you're not, so I will.
>
> [Appellant]: I ----
>
> [SA GH]: About gagging and her having to put makeup on because there was going to be tears. Whose idea was all that?

10

[Appellant]: That's mine.

. . . .

[SA GH]: And so what made you want to talk to a 13-year-old?

[Appellant]: I… I didn't know she was 13 at the time. I mean, maybe the initial post had something about how old she was, but I don't… I didn't really… I don't know. I was just bored. I just wanted to talk to literally anyone to pass the time. There was no intention behind the conversation, at all whatsoever. Just kind of let the conversation go… which I shouldn't have.

[SA GH]: At any point, did you feel comfortable -- that you could have just called it off and been all right?

[Appellant]: I should['ve]. I could['ve].

. . . .

[SA RF]: Why didn't you bring a condom?

[Appellant]: I wasn't planning on sex.

[SA GH]: Okay. Just oral?

[Appellant]: Just oral.

**2. Law**

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324 (C.M.A. 1987) (citation omitted); *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (citation omitted) (finding evidence legally sufficient to support a conviction for violating a lawful general regulation). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

With respect to the affirmative defense of entrapment, Rule for Courts-Martial (R.C.M.) 916(g) states: "It is a defense that the criminal design or suggestion to commit the offense originated in the Government and the accused had no predisposition to commit the offense." The defense has the initial burden of showing some evidence that an agent of the Government originated the suggestion to commit the crime. *United States v. Whittle*, 34 M.J. 206, 208 (C.M.A. 1992). Once raised, "the burden then shifts to the Government to prove beyond a reasonable doubt that the criminal design did not originate with the Government or that the accused had a predisposition to commit the offense . . . ." *Id.* (citations omitted). When a person accepts a criminal offer without an extraordinary inducement to do so, he demonstrates a predisposition to commit the crime in question. *Id.* (citations omitted).

"Inducement" means more than merely providing an appellant the means or opportunity to commit a crime. *United States v. Howell*, 36 M.J. 354, 360 (C.M.A. 1993) (citations omitted). Instead, the Government's conduct must:

> create[ ] a substantial risk that an undisposed person or otherwise law abiding citizen would commit the offense. Inducement may take different forms, including pressure, assurances that a person is not doing anything wrong, persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy, or friendship.

*Id.* at 359–60 (emphasis, internal quotation marks, and citations omitted).

The Government may use undercover agents and informants to ferret out crime, and afford opportunities or facilities for criminals to act upon, without implicating the defense of entrapment. *Jacobson v. United States*, 503 U.S. 540, 548 (1992); *see also Howell*, 36 M.J. at 358; *Whittle*, 34 M.J. at 208. "Artifice and stratagem may be employed to catch those engaged in criminal enterprises." *Sorrells v. United States*, 287 U.S. 435, 441 (1932) (citations omitted); *see also United States v. Russell*, 411 U.S. 423, 435–36 (1973). For example, law enforcement officers may pretend to be someone other than a government agent. *See Howell*, 36 M.J. at 358.

For Appellant to be found guilty of an attempt offense under Article 80, UCMJ, the Government was required to prove beyond a reasonable doubt that Appellant did a certain overt act, that the act was done with the specific intent to commit a certain offense, that the act amounted to more than mere preparation, and that the act apparently tended to effect the commission of the intended offense. *See Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 4.b.

Proof that the attempted offenses actually occurred or were completed by Appellant was not required. *See United States v. Church*, 29 M.J. 679, 686 (A.F.C.M.R. 1989), *aff'd*, 32 M.J. 70 (C.M.A. 1991); *see also United States v. Talkington*, No. ACM 37785, 2013 CCA LEXIS 357, at *10 (A.F. Ct. Crim. App. 26 Apr. 2013) (unpub. op.), *aff'd*, 73 M.J. 212 (C.A.A.F. 2014) (finding no requirement to prove victim was unable to decline participation for conviction of attempting to commit sexual acts while victim was pretending to be asleep). However, at the time of the acts, Appellant must have intended every element of the attempted offenses. Therefore, in order for Appellant to be found guilty of the attempted offense of sexual assault of a child as alleged in Specification 1 of the Charge, the Government was required to prove beyond a reasonable doubt that Appellant intended to commit a sexual act upon "DJ" by causing his penis to penetrate her mouth, and that at the time of the sexual act "DJ" had attained the age of 12 years but had not attained the age of 16 years. *See MCM*, pt. IV, ¶ 62.b.(2)(a).

In order for Appellant to be found guilty of the attempted offense of sexual abuse of a child by committing lewd acts upon a child who had not attained the age of 16 years, as alleged in Specification 2 of the Charge, the Government was required to prove beyond a reasonable doubt that Appellant attempted the charged conduct with an intent to gratify his own sexual desire. *See MCM*, pt. IV, ¶ 62.b.(3).

"In military justice, impossibility - whether of law or fact - is no defense in a prosecution for conspiracy or attempt." *United States v. Valigura*, 54 M.J. 187, 189 (C.A.A.F. 2000) (citation omitted). "A person who purposely engages in conduct which would constitute the offense if the attendant circumstances were as that person believed them to be is guilty of an attempt." *MCM*, pt. IV, ¶ 4.c.(3).

### 3. Analysis

At the close of the findings portion of the court-martial, the military judge found a sufficient basis to instruct the court members on the issue of entrapment. The military judge instructed the members: "In order to find [Appellant] guilty, you must be convinced beyond a reasonable doubt that [Appellant] was not entrapped." In other words, the absence of entrapment essentially became part of the case the Government had to prove beyond a reasonable doubt in order to secure a conviction.

We are convinced beyond a reasonable doubt Appellant was not entrapped. Beginning with Appellant's response to the Whisper posting by SA GH posing as "DJ," and continuing with the Whisper messages that ensued, the Government presented the opportunity for Appellant to commit the offenses of which he was convicted. At the outset of their correspondence, "DJ" informed Appellant that she was 13 years old. Appellant then chose to engage in a series of messages with her for over two weeks—even though "DJ" repeated that she was 13 years old on multiple occasions. Despite vague and flirtatious messages by both Appellant and "DJ," it was Appellant who initiated the sexual aspects of the conversation through the use of explicit and graphic sexual terms. He first divulged his sexual preferences, and then elicited the same from "DJ." "DJ" did not request any sexually explicit images, nor did she coerce or threaten Appellant into any course of action. It was Appellant, not "DJ," who raised the topic of him and "DJ" meeting in person. Although "DJ" did not agree to the initial date for the meeting, ultimately, on 29 June 2019, Appellant drove to meet her in person. *See Sorrells*, 287 U.S. at 441 ("It is well settled that the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution.").

Appellant claims inducement because "the Government originated the suggestion to commit the offenses as ['DJ'] expressed she was comfortable spending time with an older man and actively participated in and encouraged their sexual conversations." Appellant further argues that "[w]hen their conversation first turned to that of a sexual nature, ['DJ'] fueled the conversation by stating that she 'of course' had kinks and that she would share hers if he shared his first." Appellant further claims that when discussing plans to meet up with "DJ," Appellant's plans "were hypothetical and non-concrete," and that it was

"DJ" who continually asked Appellant for the "whole plan" or "full plan" in order to "entice [Appellant] to discuss engaging in sexual activity with her." Appellant contends that "[h]ad it not been for ['DJ']'s repeated persistence, it is unlikely that [Appellant] would have ever followed through in making plans to meet with her." We disagree.

Although inducement "may take different forms, including pressure . . . persuasion . . . threats, coercive tactics, harassment, [and] promises of reward," Appellant was induced only if the Government created "a substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense." *Howell*, 36 M.J. at 359–60 (emphasis, internal quotation marks, and citations omitted). The Government's actions in Appellant's case did not create such a risk and did not constitute inducement. Appellant was very much not the "unwary innocent" to be protected from government inducement. *Id.* at 358 (citations omitted). Appellant was the one who initiated communication with "DJ" by responding to her Whisper post stating, "Just moved here with my parents Any recommendations on things to do." Appellant did not hesitate to continue communicating with "DJ" after she told him that she was a 13-year-old girl living on base with her mother. Appellant initiated the discussion to set up a meeting between the two. When "DJ" could not meet at the initial date, Appellant suggested, "Let's do a weekend. So it's not rushed." Appellant made numerous references to "DJ" about engaging in oral sex with her when they met. After Appellant was apprehended when he showed up to meet "DJ," he explained to law enforcement that he did not bring a condom because he intended to engage in "just oral" sex with her. Despite Appellant's characterizations, none of the Government's actions rose to the level of inducement.

Appellant next claims he had no predisposition to commit the offenses. Appellant contends he "gave consent for law enforcement to search all of his electronic devices including his cell phone, tablet, and laptop. Despite an exhaustive search, agents found no evidence of child pornography, peer-to-peer software, or searches related to underage children." Appellant further notes that this search yielded "no evidence regarding a prior history of conversations with minors." He also states that none of the "numerous military and civilian personnel" interviewed by agents provided evidence that Appellant had an interest in minors, and that he was not involved with youth sports. Appellant highlights that he told "DJ" the youngest woman he had sex with was 20 years old. Appellant notes that he never asked "DJ" for a nude photo or sent one of himself.

We conclude that Appellant demonstrated a predisposition to commit the two convicted offenses, both of which he committed "without being offered extraordinary inducements." *See Whittle*, 34 M.J. at 208 (citations omitted). Appellant responded to the post by "DJ," and it was Appellant who decided to continue to communicate with "DJ" after she told him that she was a 13-year-old girl. The absence of any request for or transmission of sexually explicit photographs is not dispositive as to whether Appellant was predisposed to attempt to sexually assault a child or attempt to commit sexual abuse of a child. Similarly, possession of child pornography and contact with children are not necessary precursors to or prerequisites for someone to be disposed to engage in attempted sexual assault or attempted sexual abuse of a child. As described above, Appellant took the initiative to commit the offenses. By doing so, he demonstrated his predisposition.

Finding beyond a reasonable doubt that the Government did not induce Appellant to commit the two offenses of which he was convicted, and that Appellant was predisposed to commit both, we conclude there was no entrapment. Having considered the evidence produced at trial in the light most favorable to the Government, we also conclude that the evidence was legally sufficient for a rational factfinder to conclude that the Government proved beyond a reasonable doubt that Appellant was not entrapped.

Having decided there was no entrapment, we next consider whether the evidence is legally and factually sufficient to support the findings of guilt on the Charge and its two specifications. Appellant responded to "DJ's" Whisper post. Even after "DJ" told Appellant that she was a 13-year-old child living on base with her mother, Appellant decided to continue messaging her. In response to messages from "DJ," Appellant initiated a sexually graphic conversation, eventually describing, in graphic terms, the sexual acts that Appellant wanted to perform on "DJ" and the acts he wanted her to perform on him. The Whisper messages Appellant wrote to "DJ" constituted his offense of attempting to commit a lewd act on "DJ," specifically, by communicating indecent language to her regarding how he wanted to engage in oral sex with her and asking her if she wanted to try anal sex. On multiple occasions, Appellant articulated his desires to penetrate "DJ's" mouth with his penis. Then, on 29 June 2019, Appellant went to the location where "DJ" agreed to meet him, intending—per his own admission—to engage in oral sex with a 13-year-old girl.

In assessing legal sufficiency, we are limited to the evidence produced at trial and required to consider it in the light most favorable to the Prosecution. The bulk of the evidence produced at trial consisted of Appellant's own words in the form of the Whisper messages he sent "DJ." While not all the evidence was free from conflict, it did not have to be. *See Wheeler*, 76 M.J. at 568 (citation omitted). We conclude that a reasonable factfinder could have found beyond a reasonable doubt all the essential elements of Appellant's two convicted offenses: attempted sexual assault of a child by penetrating "DJ's" mouth with his penis; and attempted sexual abuse of a child by communicating sexually explicit language to "DJ." Furthermore, in assessing factual sufficiency, after weighing all the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. Therefore, we find Appellant's convictions both legally and factually sufficient.

## B. Evidence of Membership in "Teenager" Chat Group

Appellant contends the military judge abused his discretion by improperly admitting evidence that Appellant was a member of an online "teenager" chat group. Specifically, Appellant contends: (1) the military judge failed to apply Mil. R. Evid. 404(b); (2) the Defense did not open the door to the evidence; and (3) the evidence failed to pass a Mil. R. Evid. 403 analysis. We are not persuaded. Assuming *arguendo* that the military judge abused his discretion, we find the error was nonconstitutional and did not substantially influence the findings; thus, Appellant was not prejudiced.

### 1. Additional Background

The Prosecution provided pretrial notice to Appellant that "[i]f the [military judge] finds that the defense of entrapment has been raised, the Government anticipates introducing . . . evidence that [Appellant] was in a chat group where the title was 'Me and Pic (Teenagers).'"[8] The Prosecution included that the description of the group stated, "It was for real teens. Not someone behind a screen (No one over 19)."

Trial defense counsel raised the defense of entrapment during voir dire and again in opening statement. Trial defense counsel concluded his opening statement with, "it is my belief and my hope that you will find [Appellant] not guilty by reason of entrapment." During cross-examination of SA GH, trial defense counsel questioned him that there was "no searches that were located on [Appellant's] phone relating to searches for underage kids," to which SA GH responded he did not know the answer. Trial defense counsel also asked SA GH

---

[8] The Government's e-mail was inaccurately titled "405(b) Notice," but was considered as a Mil. R. Evid. 404(b) notice.

about law enforcement agencies investigating Appellant's social life and looking for evidence of Appellant's involvement in youth groups. SA GH testified that he did not know what occurred during the investigation but noted that such an investigative step "is a common procedure." At the conclusion of SA GH's testimony, an Article 39(a), UCMJ, 10 U.S.C. § 839(a), hearing was held.

During the Article 39(a), UCMJ, session, the parties discussed the Government's next witness. Up to this point, there had not been an objection or motion in limine by trial defense counsel regarding the introduction of evidence of the "teenager" chat group. The Government provided the military judge a copy of the Mil. R. Evid. 404(b) notice. Trial counsel then discussed the subject matter of the notice, stating,

> Originally, Your Honor, this was going to be in response to if the [D]efense had raised some evidence of the affirmative defense of entrapment. However, I don't even think I need to go down that analysis right now, given the questions that defense counsel basically opened up with on cross of [SA GH].

Trial counsel indicated that the Government sought to introduce testimony about Appellant's participation in a Whisper chat group. The following exchange then occurred between trial defense counsel and the military judge:

> [Military Judge (MJ)]: Well, I'll be honest -- and this is for both counsel here -- in looking at this under the basic 403 level analysis here --
>
> [Defense Counsel]: Right.
>
> [MJ]: -- I don't find it terribly probative, but I also don't find it terribly prejudicial. Because of the open questions here, in terms of -- again, [G]overnment, I get what you're saying. Well I also get what you're saying, in that "teenagers" isn't defined. This could be a group for 16 to 19-year-olds, this could be a group 13 to 19-year-olds. And without that information, it's really just open for interpretation as to exactly what this is.
>
> Now, under the rules, there is kind [of] a presumption for admissibility. And under 403, it has to be -- the probative value has to be substantially out-weighed by the danger of unfair prejudice. As I said, I don't find it to be terribly probative or terribly prejudicial. So at this point, I think what I'm going to do is: if you want to ask about this, trial counsel, I will allow it. And then of course, defense counsel, you have great leeway to go down the road on cross examination as to exactly what this means.
>
> . . . .

18

> [Defense Counsel]: I think what Your Honor is saying though is: since it doesn't have any probative value, I think really speaks to the balancing test of, this is going to confuse and mislead and has a great potential to do so for the panel members. We know nothing about this and this is all we know. In fact, it is. And the [G]overnment wants to imply a degree of criminality for something that we don't know if it is, and that is highly prejudicial. And I don't understand my being able to cross and say, we'll [sic] you don't know anything about it, doesn't cure that implication.

> [MJ]: Okay. Well, again, in my look at this, I don't find it to be terribly probative or prejudicial. And under the balancing analysis, it has to be substantially out-weighed by the danger of unfair prejudice, and I'm not just seeing it at this point. So at this point, I will allow this particular piece into evidence.

After the military judge's ruling allowing the admission of the evidence, the Government called SA RF to testify regarding the manual search of Appellant's tablet. SA RF testified regarding groups with which Appellant was associated in the Whisper application:

> So he was associated to a group called, "Me and Pics," and in [parentheses] next to the title "Me and Pics" was "teenagers." And there was a description of the group that said, for no one hiding behind a screen. And then in parentheses, it said, no one over the age of 19.

(Alteration in original). On cross-examination, SA RF testified that he did not know if Appellant ever participated in the chat group, did not know what the title "Me and Pic" meant, and did not know if Appellant provided a picture to join the chat group.

### 2. Law

We review a military judge's decision to admit or exclude evidence for an abuse of discretion. *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008) (citing *United States v. Ayala*, 43 M.J. 296, 298 (C.A.A.F. 1995)). "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citation omitted).

The Discussion to R.C.M. 916(g) states, "When the defense of entrapment is raised, evidence of uncharged misconduct by the accused of a nature similar to that charged is admissible to show predisposition."

Mil. R. Evid. 404(b) provides that evidence of a crime, wrong, or other act is generally not admissible as evidence of a person's character in order to show the person acted in conformity with that character on a particular occasion. However, such evidence may be admissible for another purpose, including, *inter alia*, to prove intent, knowledge, or absence of mistake. Mil. R. Evid. 404(b)(2). The list of potential purposes in Mil. R. Evid. 404(b)(2) "is illustrative, not exhaustive." *United States v. Ferguson*, 28 M.J. 104, 108 (C.M.A. 1989). We apply a three-part test to review the admissibility of evidence under Mil. R. Evid. 404(b):

> 1. Does the evidence reasonably support a finding by the court members that [the] appellant committed prior crimes, wrongs or acts?
>
> 2. What "fact . . . of consequence" is made "more" or "less probable" by the existence of this evidence?
>
> 3. Is the "probative value . . . substantially outweighed by the danger of unfair prejudice"?

*United States v. Staton*, 69 M.J. 228, 230 (C.A.A.F. 2010) (alterations in original) (quoting *United States v. Reynolds*, 29 M.J. 105, 109 (C.M.A. 1989)).

Mil. R. Evid. 403 permits the military judge to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one of more of the following: unfair prejudice, confusing the issues, misleading the members, undue delay, wasting time, or needlessly presenting cumulative evidence."

A military judge's rulings under Mil. R. Evid. 404(b) and Mil. R. Evid. 403 will not be disturbed except for a clear abuse of discretion. *United States v. Morrison*, 52 M.J. 117, 122 (C.A.A.F. 1999) (citing *United States v. Miller*, 46 M.J. 63, 65 (C.A.A.F. 1997)).

Mil. R. Evid. 405(b) allows "character or a character trait [that] is an essential element" of a claim or defense to be "proved by relevant specific instances of the person's conduct." "Character might be an element of a defense if entrapment is claimed and the [G]overnment wants to prove predisposition." *United States v. Schelkle*, 47 M.J. 110 (C.A.A.F. 1997).

Our superior court has provided a framework for how to assess erroneous but nonconstitutional evidentiary rulings:

> The test for nonconstitutional error is whether the error itself had substantial influence on the findings. . . .
>
> We evaluate prejudice from the military judge's erroneous evidentiary ruling by weighing (1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of

the evidence in question, and (4) the quality of the evidence in question.

*United States v. Moolick*, 53 M.J. 174, 177 (C.A.A.F. 2000) (internal quotation marks and citations omitted).

### 3. Analysis

Appellant contends on appeal, as he did at trial, that the military judge erred in admitting evidence of Appellant's membership in an online chat group for teenagers. Appellant identifies three reasons the military judge abused his discretion in admitting the "teenager" chat group evidence: (1) the military judge failed to apply Mil. R. Evid. 404(b); (2) trial defense counsel did not open the door to the evidence; and (3) the evidence did not pass the Mil. R. Evid. 403 balancing analysis. Appellant further argues admission of the evidence resulted in prejudice. We disagree.

We find the military judge did not abuse his discretion in admitting evidence that tended to show Appellant's membership in a chat group for teens. Although there was no evidence of Appellant's specific activity, if any, in the teen chat group, there was evidence he was associated with the chat group focused on teens. Appellant's membership in this group was some evidence of character of predisposition to attempt to commit the illegal acts of child sexual assault and sexual abuse of a child, and made it more probable Appellant was predisposed to commit the charged offenses and was therefore not entrapped. Finally, although the evidence had minimal probative value, it was not substantially outweighed by the danger of unfair prejudice, including confusion and waste of time. Contrary to the assertion of the trial defense counsel, we do not find the evidence "implied a degree of criminality" that was "highly prejudicial." We find the military judge did not abuse his discretion in admitting it.

Assuming *arguendo* that the military judge abused his discretion by admitting evidence of membership in the chat group as evidence of predisposition to attempt to commit the illegal acts of child sexual assault and sexual abuse of a child, we find the error was "nonconstitutional." *Moolick*, 53 M.J. at 177. Appellant was not deprived of his right to present a defense, specifically, the defense of entrapment. We further find the error did not have a "substantial influence on the findings" and Appellant was not prejudiced. *Id.* (internal quotation marks and citations omitted).

Applying the *Moolick* four-part test, we determine the Government's case against Appellant was solid, and was centered on Appellant's own statements, actions, and admission. As we find beyond a reasonable doubt that Appellant was predisposed to commit the charged offenses based on his own statements and actions, we do not find the evidence of membership in a chat group to be

highly material. Moreover, the chat group was mentioned only briefly by counsel during sentencing arguments. Thus, we conclude that, even if the military judge erred in admitting the evidence of evidence of membership in a chat group to show Appellant's predisposition, the error did not prejudice Appellant.

## C. Motion to Compel Discovery

### 1. Additional Background

In order to comprehend Appellant's claim on appeal, we must first outline the documents at issue. The record supports the existence of the following documents: (1) the NCIS Operational Plan for the arrest of Appellant ("NCIS Arrest Plan"); (2) the Internet Crimes Against Children (ICAC) investigation and operational standards; and (3) the Tsunami Roll operational plan documents. Before trial, the Government filed a motion for the military judge to review the NCIS Arrest Plan *in camera*. The military judge agreed, and ordered that the parties would have access to the plan under a protective order. On appeal, Appellant does not challenge the military judge's denial of Appellant's motion at trial to compel the ICAC investigation and operational standards or the Tsunami Roll operational plan documents. Appellant now claims, but did not claim at trial, that there is an undisclosed "NCIS operational plan" distinct from documents (1) through (3).

On the first day of trial, trial defense counsel made an oral motion to compel "the Tsunami Roll document as well as the operational investigative standards under ICAC." Neither of these documents had been provided in pretrial discovery. However, the Government did provide Appellant's trial defense counsel with a copy of the NCIS Arrest Plan pertaining to Appellant, provided by NCIS in pretrial discovery. This plan detailed the law enforcement procedures employed during Appellant's arrest.

While engaging the military judge on the oral motion to compel discovery, trial defense counsel stated:

> It's under -- and there's also the Tsunami Roll, which is also the specific operational plan under which all of these are held. And when we talked to [SA GH] about it, he said this falls within that concept. So certainly the Tsunami Roll, which was formally [sic] Habu Strike, and that's all part of the ICAC "sting," shall we say.

During argument on the motion, circuit trial counsel stated they provided the Defense with "what [they] had for Tsunami Roll." Civilian defense counsel explained:

> So, what we got was the ROI . . . . I want the originating document. The one we were given was dated 12 July 2019. He keeps talking about Tsunami Roll as a 2013 document. So this is just

> an ROI that talks about – it doesn't have specific reference necessarily… only specific to my client. I want to know how we got to this point.

After hearing testimony from SA GH on the motion, the military judge found that the "documents authorizing Tsunami Roll set forth logistical items including funding," but "[did] not include detailed standards for conducting operations." The military judge found that SA GH had not reviewed the Tsunami Roll documents since 2013 and these documents "[did] not contain standards to be use[d]" in conducting the investigation into Appellant. The military judge also addressed the connection between SA GH's operation and ICAC, finding that the operation "was not conducted under the auspices of an ICAC Task Force, therefore compliance with the ICAC was not required." The military judge ruled that "the [D]efense ha[d] not shown that the documents requested [were] relevant to the current proceedings" and denied the motion to compel Tsunami Roll documents and ICAC investigation and operational standards.

Later, during SA GH's findings testimony, the following exchange between trial defense counsel and SA GH took place:

> [Defense Counsel]. Okay. Now I want to talk about the safety of your operational plans. Is there an Op Plan for this operation?
>
> [SA GH]. So… I'm learning that we're getting mixed up. So there is an Op Plan for an arrest and an Op Plan for the operation. Which one are you referencing?
>
> [Defense Counsel]. The Op Plan -----
>
> [SA GH]. To answer your question, there's two. Yes.
>
> [Defense Counsel]. Yes. I see. My question was: is there an Op Plan for this operation?
>
> [SA GH]. Yes. There is.
>
> [Defense Counsel]. Okay. And then there was an Op Plan for the arrest, as you just referenced?
>
> [SA GH] Okay. Yes, sir. We call them both "operations," so I think that's where we are getting mixed up.
>
> [Defense Counsel]: Okay.
>
> [SA GH]. So yes, sir.

There was no further questioning on this matter and trial defense did not make a motion to compel any additional documents after this testimony.

**2. Law**

In reviewing discovery matters, we conduct a two-step analysis: "[F]irst, we determine whether the information or evidence at issue was subject to disclosure or discovery; second, if there was nondisclosure of such information, we test the effect of that nondisclosure on the appellant's trial." *United States v. Coleman*, 72 M.J. 184, 187 (C.A.A.F. 2013) (quoting *United States v. Roberts*, 59 M.J. 323, 325 (C.A.A.F. 2004)). The Government shall, after service of charges, with a defense request, permit inspection of items "relevant to defense preparation." R.C.M. 701(a)(2)(B). *Roberts* is instructive on how we may review a military judge's discovery decision:

> An appellate court reviews a military judge's decision on a request for discovery for abuse of discretion. *United States v. Morris*, 52 M.J. 193, 198 (C.A.A.F. 1999). A military judge abuses his discretion when his findings of fact are clearly erroneous, when he is incorrect about the applicable law, or when he improperly applies the law. In this case, we are not dealing with any factual determinations.

59 M.J. at 326.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The United States Supreme Court subsequently extended *Brady*, clarifying "that the duty to disclose such evidence is applicable even though there has been no request by the accused" and includes "impeachment evidence as well as exculpatory evidence." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citations omitted); *see also United States v. Claxton*, 76 M.J. 356, 359 (C.A.A.F. 2017) (quoting *Strickler*, 527 U.S. at 280). "A military accused also has the right to obtain favorable evidence under Article 46, UCMJ, 10 U.S.C. § 846 (2006), as implemented by R.C.M. 701–703." *Coleman*, 72 M.J. at 186–87 (footnotes omitted). Accordingly, Article 46, UCMJ, and these implementing rules provide statutory discovery rights to a military accused that are greater than those afforded by the Constitution. *Id.* at 187 (citations omitted); *see also Roberts*, 59 M.J. at 327 (analyzing the "the broad nature of discovery rights granted the military accused under Article 46").

"Trial counsel must exercise due diligence in discovering [favorable evidence] not only in his possession but also in the possession . . . of other 'military authorities' and make them available for inspection." *United States v. Jackson*, 59 M.J. 330, 334 (C.A.A.F. 2004) (alterations in original) (quoting *United States v. Simmons*, 38 M.J. 376, 381 (C.M.A. 1993)). "[T]he parameters of the review that must be undertaken outside the prosecutor's own files will depend in any

particular case on the relationship of the other governmental entity to the prosecution and the nature of the defense discovery request." *United States v. Williams*, 50 M.J. 436, 441 (C.A.A.F. 1999). The scope of this due-diligence requirement is generally limited to:

> (1) the files of law enforcement authorities that have participated in the investigation of the subject matter of the charged offenses; (2) investigative files in a related case maintained by an entity closely aligned with the prosecution; and (3) other files, as designated in a defense discovery request, that involved a specific type of information within a specified entity.

*Id.* (internal quotation marks and citations omitted).

Where the defense specifically requests discoverable information that is erroneously withheld, the error is tested for harmlessness beyond a reasonable doubt. *Coleman*, 72 M.J. at 187 (citations omitted). "Failing to disclose requested material favorable to the defense is not harmless beyond a reasonable doubt if the undisclosed evidence might have affected the outcome of the trial." *Id.* (citation omitted). "[A]n inadvertent nondisclosure has the same impact on the fairness of the proceedings as deliberate concealment." *Strickler*, 527 U.S. at 288. However, "[m]ere speculation that some exculpatory material may have been withheld is unlikely to establish good cause for a discovery request on collateral review," *id.* at 286, "[n]or . . . should such suspicion suffice to impose a duty on [defense] counsel to advance a claim for which they have no evidentiary support," *id.*

In addition to the discovery rights described above, R.C.M. 703 provides that "[e]ach party is entitled to the production of evidence which is relevant and necessary." R.C.M. 703(e)(1); *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004). Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "is of consequence in determining the action." Mil. R. Evid. 401. "Relevant evidence is necessary when it is not cumulative and when it would contribute to a party's presentation of the case in some positive way on a matter in issue." *Rodriguez*, 60 M.J. at 246 (internal quotation marks and citation omitted). The moving party is required, as a threshold matter, "to show that the requested material existed." *Id.*

### 3. Analysis

On appeal, Appellant argues the military judge erred by denying a motion to compel discovery of the "NCIS operation plan" used in Appellant's case. However, despite Appellant's claim on appeal, we find the military judge did not deny Appellant's motion to compel with regard to the purported "NCIS operational plan." As an initial matter, we examine Appellant's oral motion to

compel at trial to determine what evidence was the subject of the motion. The "NCIS operational plan" was not the subject of the motion to compel at trial. Appellant's motion to compel at trial was focused on "the Tsunami Roll document as well as the operational investigative standards under ICAC." As part of pretrial discovery, Appellant was provided with a copy of the operational plan maintained by NCIS that detailed the procedures employed by law enforcement during Appellant's arrest. On appeal, Appellant does not challenge the military judge's denial of Appellant's motion to compel the Tsunami Roll documents or the ICAC investigation and operational standards. What Appellant now claims, but did not claim at trial, is that there was an additional "NCIS operational plan" that was not disclosed.

Appellant's claim with regard to an "NCIS operational plan" stems from SA GH's testimony in findings, in which SA GH referred to two operational plans. Appellant's claim is misguided, as the record does not support that there was an additional, nondisclosed operational plan. Appellant relies on the testimony of SA GH in which the latter referenced a plan for the operation, and a second plan for Appellant's arrest. However, there was no follow-up questioning as to the details regarding the plan for the operation. During his testimony, SA GH acknowledged confusion in discussing the operational plans, testifying, "[W]e are getting mixed up." SA GH's findings testimony regarding two operational plans must be viewed in context with the totality of the record, to include his testimony on the motion to compel discovery.

On the motion, SA GH was questioned regarding the plans associated with Appellant's investigation. His testimony does not support the conclusion that there was an undisclosed "NCIS operational plan." Rather, his testimony, and the record taken as a whole, supports the conclusion that the purported "NCIS operational plan" was in fact just another description of the Tsunami Roll documents.[9]

Appellant fails to carry his initial burden that some of the evidence ever existed such that it could be discovered or produced. Therefore, we find no abuse of discretion as Appellant did not show the evidence existed under *Strickler*, 527 U.S. at 286. Appellant does not establish that an "NCIS operational plan," separate and apart from the Tsunami Roll documents and the NCIS operation plan for the arrest of Appellant existed such that it could be

---

[9] Another possible interpretation would be that SA GH used the term "Op Plan" to describe his investigative steps, which would have been captured in any report of investigation, agent notes, or case file. Regardless, based on the record before us, Appellant has failed to demonstrate that there were investigative documents that the Government failed to disclose.

discovered or produced. *See Strickler*, 527 U.S. at 286. We find the military judge did not abuse his discretion as claimed by Appellant.

**D. Timely Appellate Review**

Appellant's case was docketed with this court on 8 May 2020. Appellant's counsel requested and was granted ten enlargements of time to file his brief, of which five included an explicit statement that Appellant understood his right to timely appellate review and consented to the enlargement. The Government opposed all the requested enlargements. Appellant filed his assignments of error on 2 June 2021. The Government requested and was granted a single enlargement of time to file its answer. Appellant then requested and was granted an enlargement of time to file his reply. Additionally, on 23 December 2021, Appellant requested leave of this court to file a supplemental assignment of error with respect to issue (5), which was granted the same date as this court's decision, which was rendered approximately 21 months after docketing.

Because this opinion was not issued within 18 months of docketing, this delay is facially unreasonable. *See United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006). Because there is facially unreasonable appellate delay, we consider the factors articulated in *Barker v. Wingo*, 407 U.S. 514 (1972). Appellant did not demand speedy appellate review. *See Moreno*, 63 M.J. at 138. Moreover, he has made no specific claim of prejudice with regard to presumptively unreasonable delay, and we find none. *See id.* at 138–39 (citations omitted). To the contrary, Appellant submitted a declaration with his supplemental assignment of error, which cited *Moreno* and stated that he waived his speedy appellate rights. However, we are not bound by such waiver. *See United States v. Hardy*, 77 M.J. 438, 442–43 (C.A.A.F. 2018); *United States v. Chin*, 75 M.J. 220, 223 (C.A.A.F. 2016) (citation omitted) (addressing this court's responsibility to "assess the entire record to determine whether to leave an accused's waiver intact, or to correct the error").

We find the delay in appellate review did not "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). A substantial portion of the delay is the result of Appellant's requested enlargements of time. After balancing the *Barker* factors, we find no due process violation for appellate delay.

Finally, applying *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we considered all the facts and circumstances with regard to the appellate delay and decline to exercise our Article 66(d), UCMJ, authority for excessive delay absent a due process violation. *See also United States v. Tardif*, 57 M.J. 219, 223–24 (C.A.A.F. 2002). After full consideration, we find Appellant is not entitled to relief for facially unreasonable appellate delay.

### III. CONCLUSION

The findings and sentence as entered are correct in law and fact, no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court