# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
FLEMING, HAYES, and PARKER
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Sergeant LANCE E. COLBERT**
**United States Army, Appellant**

ARMY 20200259

Headquarters, Fort Bliss (trial)
Headquarters, U.S. Combined Arms Center and Fort Leavenworth (*DuBay* Hearing)
James P. Arguelles and Michael S. Devine, Military Judges (trial)
Steven C. Henricks, Military Judge (*DuBay* Hearing)
Colonel Andrew M. McKee, Staff Judge Advocate (trial)
Colonel Robert L. Manley III, Staff Judge Advocate (*DuBay* Hearing)

For Appellant: Colonel Michael C. Friess, JA; Jonathan Potter, Esquire; Major Rachel P. Gordienko, JA; Captain Julia M. Farinas, JA (on brief); Colonel Michael C. Friess, JA; Jonathan Potter, Esquire; Captain Lauren M. Teel, JA; Captain Julia M. Farinas, JA; (on reply brief and first supplemental brief); Colonel Michael C. Friess, JA; Major Rachel P. Gordienko, JA; Captain Ian P. Smith, JA; Jonathan Potter, Esquire (second supplemental brief).

For Appellee: Colonel Christopher B. Burgess, JA; Lieutenant Colonel Craig J. Schapira JA; Major Pamela L. Jones, JA; Captain Thomas J. Darmofal, JA (on brief and first supplemental brief); Colonel Christopher B. Burgess, JA; Major Pamela L. Jones, JA (on response to appellant's second supplemental brief).

13 December 2023

--------------------------------
MEMORANDUM OPINION
--------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

FLEMING, Senior Judge:

Appellant asserts, both through counsel and pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), multiple errors meriting discussion; one of

which merits relief.[1] The alleged errors meriting discussion involve two general areas: (1) whether the government failed to disclose or preserve evidence; and (2) whether appellant's trial defense counsel were ineffective.

As to the government's alleged failure to disclose or preserve evidence, we find the evidence was not favorable and material to the defense. The evidence was, in the light most favorable to the defense, only "potentially useful," and appellant did not file a specific discovery request. After our review of the record, even if the government was required to disclose the evidence in response to a generic defense discovery request, a reasonable probability of a different result at trial does not exist.

Appellant alleges his trial defense counsel were ineffective, in multiple ways, during both the findings and pre-sentencing phases of his case. We determine appellant's counsel were not ineffective during the findings phase and, even assuming ineffectiveness at that stage, appellant was not prejudiced. We affirm appellant's conviction, consistent with his plea, to intentional (unpremeditated) murder.

We determine, however, appellant's defense counsel *were* ineffective in the pre-sentencing phase and appellant was prejudiced. We set aside appellant's sentence and authorize a sentence rehearing in our decretal paragraph.[2]

## BACKGROUND

A military judge convicted appellant, pursuant to his pleas, of one specification of intentional (unpremeditated) murder in violation of Article 118(2), Uniform Code of Military Justice [UCMJ], 10 U.S.C. §918.[3] The military judge

---

[1] We have given full and fair consideration to the remaining matters personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982) and, other than the matters related to the ineffective assistance of his trial defense counsel, we determine they merit neither discussion nor relief.

[2] Our decision setting aside appellant's sentence moots his multiple claims of error allegedly occurring during his pre-sentencing case. Our decision, however, does not set aside his finding of guilty to intentional murder or warrant the nullification of his plea agreement negotiated with the government.

[3] Appellant pleaded not guilty to numerous offenses, including premediated murder, pursuant to plea agreement terms requiring the government to offer no evidence on those offenses and for the military judge to enter a finding of not guilty to those numerous offenses.

sentenced appellant to a dishonorable discharge, confinement for life without the eligibility for parole (LWOP), total forfeiture of all pay and allowances, and reduction to the grade of E-1.[4] The convening authority approved the findings of guilty and only so much of the sentence including a dishonorable discharge, confinement for LWOP, and reduction to the grade of E-1.

Appellant murdered his wife with a thirteen-inch tactical fixed blade knife. This is not disputed. Appellant lacerated his wife's liver and lungs, left visible blade marks on her spine, and repeatedly called her "bitch" while stabbing her multiple times in her chest, abdomen, shoulder, and upper back while bystanders watched.

In November 2016, approximately two-and-a-half years before the murder, appellant married his wife, a fellow soldier. From the beginning, they experienced marital problems surrounding appellant's infidelities and possessiveness. In August of 2018, while appellant's wife was deployed overseas, she notified him that she wanted a divorce. Appellant's wife redeployed on 31 March 2019. Appellant murdered her a week later, on 6 April 2019.

Upon her redeployment, appellant strongly advised his wife that he did not want a divorce. His wife did not agree. Members of the wife's unit observed the growing tension between her and appellant. On 5 April 2019, appellant's wife, with help from her friends from the unit, moved out of the marital home and into a local hotel room.

On the evening of 6 April 2019, appellant asked to borrow a subordinate soldier, Private First Class (PFC) ███'s minivan. Appellant then drove his own

---

[4] As to appellant's plea agreement and the maximum amount of confinement he faced based on his plea of guilty to intentional murder, we find the military judge thoroughly discussed and confirmed appellant's understanding that a mandatory minimum did not exist regarding the offense of intentional murder but a sentence of confinement for life without the eligibility of parole was authorized. This scenario allowed the parties to negotiate a plea agreement term authorizing the military judge to adjudge confinement between a minimum of zero days to a maximum of life without the eligibility of parole. Further, the military judge thoroughly discussed and confirmed appellant's understanding that his plea of not guilty to premeditated murder, pursuant to his plea agreement, meant he would not face a mandatory minimum punishment of confinement for life with the eligibility of parole. The *Dubay* military judge determined appellant's trial defense counsel properly advised appellant concerning his plea agreement terms and "under the plea agreement's terms that the military judge could [possibly] sentence the appellant to confinement for life without the possibility of parole."

3

vehicle to a sporting goods store to purchase the previously discussed thirteen-inch tactical fixed blade knife and a pair of compact binoculars. Appellant, with his newly acquired purchases, drove PFC ██'s minivan to the parking lot of his wife's hotel and waited within observation distance of her parked vehicle.

In the early evening hours, appellant's wife departed her hotel room, entered the parking lot, and left in her vehicle to attend a unit redeployment party at a fellow soldier's on-post house. Appellant followed her to the house in PFC ██'s minivan and parked outside. Appellant texted a friend that appellant was using PFC ██'s minivan to follow his wife "so she won't see me." While parked outside the unit house party, appellant utilized his new binoculars to spy on the house and his wife from a distance. At some point during the party, appellant's wife became aware of appellant's actions. She texted a friend that her husband was "stalking" her.

At 2015, appellant left his surveillance of his wife to drive to a nearby 7-Eleven to purchase beer and a cigarillo. At some point, he returned to the vicinity of the party and continued to spy on his wife from afar. At approximately 2210, while driving PFC ██'s minivan past the house party, appellant hit another car parked on the street. Appellant quickly drove out of sight, parked, departed the minivan, and began to run.

Within minutes of departing the minivan, appellant texted PFC ██ that "I'm sorry man." In response to PFC ██ inquiring via a return text what appellant meant, appellant next texted, "I wrack and I'm about to kill my wife." After appellant's disturbing response, PFC ██ immediately called appellant. Appellant answered the phone. Appellant repeated to PFC ██ that appellant was going to kill his wife and asserted he had a knife.

About this time, appellant's wife and a fellow unit soldier, Sergeant (SGT) ██, were departing the unit house party. Captain (CPT) ██, who was standing outside the house attempting to find the driver of the minivan after the hit and run accident, observed appellant approaching the house out of breath. Appellant told CPT ██ that appellant was out of breath because he had been out for a jog. Captain ██ was suspicious of this response because appellant was wearing unlaced Chuck Taylor shoes. Appellant then started running toward his wife and SGT ██ who were attempting to enter a parked vehicle. Captain ██ started running behind appellant in close pursuit. Appellant, however, was able to fling open the passenger door his wife was attempting to enter. Appellant began stabbing his wife with his knife in a punching motion.

Appellant repeatedly stabbed his wife ten times and cut her nine times, only stopping when CPT ██ was able to pull appellant off his wife. After being pulled off his wife and subdued, appellant told CPT ██ that appellant had stabbed his wife, she had caught him cheating, and she wanted a divorce.

4

Sergeant ▇ immediately drove appellant's wife to the emergency room. Upon her arrival at the hospital, appellant's wife was found slumped on the passenger side floorboard in the fetal position. The floor mat of the vehicle was saturated in her blood, and she had no pulse. Hospital personnel worked desperately to save her life, but she was pronounced dead from her severe injuries just under one hour after her arrival.

Back at the unit house party, military police and paramedics arrived. Responding paramedics noted appellant did not seem incoherent or intoxicated but rather appeared hostile and intent on harming himself. Appellant told one paramedic that his wife found appellant cheating and she made him mad two days prior. Appellant refused to take responsibility for his actions, however, stating to military police he did not believe he had hurt his wife.

Appellant was escorted to the hospital. His intake records listed depression, suicidal thoughts, homicidal thoughts, substance abuse, and violent behavior as his chief complaints. Appellant told an emergency room doctor, Dr. ▇, that after drinking alcohol and smoking marijuana with a person named "Cowboy," whom appellant met at the nearby 7-Eleven, appellant became enraged seeing another soldier speaking to his wife so "he jumped from the vehicle" and stabbed her.

While at the hospital, appellant underwent two types of blood draw.[5] One blood draw was ordered by appellant's company commander for the singular purpose of determining appellant's blood alcohol content. The other blood draw was ordered by Dr. ▇ to determine appellant's blood alcohol or drug content and to obtain other routine medical information. The blood tests ordered by Dr. ▇ were negative not only for marijuana, which appellant alleges he used, but also a variety of other drugs such as barbiturates, cocaine, amphetamines, and opiates.

After appellant's court-martial, Dr. ▇ filed an affidavit with this court asserting his opinion, captured in his medical treatment and diagnosis notes taken contemporaneously with appellant's hospital visit, that appellant was displaying bizarre behavior. Dr. ▇ asserted appellant "was disoriented, experiencing visual and auditory hallucination, was not oriented to date and time, and had an altered thought process, among other symptoms." Appellant also filed a post-trial affidavit

---

[5] During the appellate process, several questions were raised regarding who might have ordered a blood draw from appellant, how many blood draws occurred, the outcome of any testing, and if any of appellant's blood remained available for testing. Based on these uncertainties, we ordered a hearing pursuant to *United States v. Dubay*, 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967) to clarify not only the above questions but also to determine the details of the discovery process between the parties regarding appellant's blood draws.

with this court stating he smoked "what I thought was marijuana" and described "feeling incredibly paranoid and crazy afterward."

Dr. ■ believed appellant's behavior was consistent with the ingestion of a synthetic substance which the standard hospital blood screening test would not have revealed. Dr. ■ alleged he had handwritten an order requesting appellant's blood be sent to a different, specialized laboratory to test for synthetic substances and other poisons. Dr. ■ stated he was never contacted by appellant's trial defense counsel.

As the facts surrounding appellant's two blood draws are closely related to his allegations regarding not only the government's alleged failure to disclose or preserve evidence but also the ineffectiveness of his trial defense counsel, we first discuss the law as to each alleged error and then address our analysis regarding the legal issues related to any blood drawn from appellant.

## LAW AND DISCUSSION

*Government's Discovery and Preservation of Evidence Obligations*

Article 46, UCMJ mandates "trial counsel, the defense counsel, and the court-martial shall have equal opportunity to obtain witnesses and other evidence in accordance with such regulations as the President may proscribe." UCMJ art. 46(a). Along these lines, Rule for Courts-Martial (R.C.M.) 703(a) mandates the prosecution and the defense "shall have equal opportunity to obtain witnesses and evidence," and R.C.M. 703I(1) affirms "[e]ach party is entitled to the production of evidence which is relevant and necessary."

As to the government's sua sponte duty to disclose evidence to the defense, the government commits a discovery violation in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), when it "withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment." *United States v. Behenna*, 71 M.J. 228, 237-38 (C.A.A.F. 2012) (citing *Smith v. Cain*, 565 U.S. 73, 75 (2012)); *see also* R.C.M. 701(a)(6). Favorable evidence is "exculpatory, substantive evidence or evidence capable of impeaching the government's case. *Id.* at 238 (internal citations omitted). "Evidence is material when 'there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.'" *Id.* (citing *Smith*, 565 U.S. at 75). Once a *Brady* violation is established, there is no need to test for harmlessness. *Id.* (citing *Kyles v. Whitley*, 514 U.S. 419, 435-36 (1995)).

The government's duty to disclose evidence pursuant to a defense discovery request depends on whether the request was generic or specific. *See United States v. Coleman*, 72 M.J. 184, 187 (C.A.A.F. 2013). A defense request is specific if it:

> First, . . . on its face or by clear implication, identif[ies]
> the specific file, document or evidence in question.
> Second, unless the request concerns evidence in the
> possession of the trial counsel, the request must
> reasonably identify the location of the evidence or its
> custodian. Third, the specific request should include a
> statement of the expected materiality of the evidence to
> preparation of the defense's case unless the relevance is
> plain.

*United States v. Ellis*, 77 M.J. 671, 681 (Army Ct. Crim. App. 2018). If the government fails to disclose discoverable evidence in response to a specific defense request, appellant is entitled to relief unless the government can show the nondisclosure was harmless beyond a reasonable doubt. *United States v. Claxton*, 76 M.J. 356, 359 (C.A.A.F. 2017) (citing *United States v. Roberts*, 59 M.J. 323, 327 (C.A.A.F. 2004)). In cases in which the defense made no or only a generic request for discovery, the standard of review is whether there is a reasonable probability that there would have been a different result at trial had the evidence been disclosed. *Coleman*, 72 M.J. at 186 (citing *Smith*, 565 U.S. at 75).

As to preserving evidence, appellant must show the evidence possessed an exculpatory value that was or should have been apparent to the Government before it was lost or destroyed. *See California v. Trombetta*, 467 U.S. 479, 489 (1984); *United States v. Simmermacher*, 74 M.J. 196, 198 (C.A.A.F. 2015). *See also Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) (holding the government's failure to preserve "potentially useful evidence" does not constitute a denial of due process absent bad faith).

*Defense Counsel's Performance*

We review claims of ineffective assistance of counsel de novo. *United States v. Furth*, 81 M.J. 114, 117 (C.A.A.F. 2021) (citing *United States v. Carter*, 79 M.J. 478, 480 (C.A.A.F. 2020)). Military courts evaluate ineffective assistance claims using the Supreme Court's framework from *Strickland v. Washington*, 466 U.S. 668 (1984). *Id.* "Under *Strickland*, an appellant bears the burden of demonstrating that (a) defense counsel's performance was deficient, and (b) this deficient performance was prejudicial." *Id.* (citing *Strickland*, 466 U.S. at 687).

In evaluating performance, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. This presumption can be rebutted by "showing specific errors [made by defense counsel] that were unreasonable under prevailing professional norms." *United States v. McConnell*, 55 M.J. 479, 482 (C.A.A.F. 2001) (citing *United States v. Scott*, 24 M.J. 186, 188 (C.M.A. 1987)). In defining what

7

Court has stated a "defendant must show that counsels' representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Further, a court must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690.

Even where counsel has committed an unreasonable error, it "does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. Appellant must "affirmatively prove prejudice." *Id.* at 693. This means appellant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "The likelihood of a different result must be *substantial*, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (emphasis added). This requires consideration of "the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695. Appellant must show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.

*Appellant's Blood Draws*

First, we discuss the *Dubay* military judge's findings regarding the blood draw ordered by Dr. ███. Those samples were never sent to a different laboratory for specialized testing.[6] The hospital destroyed any blood samples taken from appellant within seven to fourteen days after the laboratory's receipt or testing of his blood; approximately mid-to-late April 2019. The trial counsel provided appellant's defense counsel with the hospital's test results, which were negative not only for appellant's alleged marijuana use but for a variety of other drugs. Although the *Dubay* military judge could not determine the exact timeframe the government trial

---

[6] The *Dubay* military judge's ruling states "Dr. ███ testified he had drawn between approximately ten to twenty vials of blood from the appellant, he closely interacted with and oversaw the nurse who drew the numerous vials of blood, and [he] ensured the vials and specialized written orders were all delivered to the ... laboratory." The nurse's testimony contradicted (a gross understatement) Dr. ███ on all his points. The nurse specially testified "she drew only a few vials of blood from appellant, Dr. ███ did not order any specialized testing of the appellant's blood, Dr. ███ did not closely interact with her when she drew blood from the appellant, and Dr. ███ did not take any special steps to ensure delivery of the appellant's blood to the ... laboratory." Despite this disparate witness testimony, the military judge determined, as do we, the important derived fact for purposes of analyzing appellant's allegations was a determination that specialized testing of appellant's blood allegedly ordered by Dr. ███ did not occur.

counsel notified the defense that appellant's blood samples were destroyed, the military judge determined it occurred during the discovery phase and prior to trial.

As to the commander's blood draw, appellant's blood sample was sent to the Armed Forces Medical Examiner System (AFMES) at Dover Air Force Base, Delaware. Appellant's blood was analyzed for alcohol content with a result of .069. No other test was performed. The AFMES maintained appellant's blood sample for two years, per their standard operating procedure, and his sample was destroyed mid-April 2021 (almost a year after appellant's court-martial). The *Dubay* military judge found government trial counsel "did not specifically know and never realized . . . appellant had a [AFMES] blood sample drawn" during the discovery phase through the adjournment of appellant's court-martial and only became aware of the test when the trial counsel was "contacted/interviewed" for the *Dubay* hearing.

The trial counsel, however, "did provide to the defense a single document at least twice obliquely referencing the [AFMES sample] and/or testing" prior to appellant's court-martial. This reference, an entry contained in a United States Army Criminal Investigation Command (CID) Agent Investigative Report (AIR), stated "about 0256, 7 Apr 19, SA [█] coordinated with 2LT [█] ... who provided a memorandum signed by CPT [█, appellant's commander] ... requesting a Legal Blood Alcohol test ... for [appellant].

Having resolved several factual questions at the *Dubay* hearing regarding appellant's blood draws, we must now determine whether the government was required, sua sponte, to either provide further discovery or preserve the evidence for the defense or if the defense specifically requested discovery regarding appellant's blood draw maintained at AFMES. The answer to both questions is no.

On its face, the AFMES blood draw did not contain evidence favorable or material to the defense. The AFMES' blood test only revealed appellant's blood alcohol level and nothing further. Failure to preserve "potentially useful evidence" does not violate appellant's due process rights absent the government's bad faith. *Youngblood*, 488 U.S. at 58. The *Dubay* military judge determined the trial counsel was unaware of the AFMES blood alcohol test until notified of the *Dubay* hearing and the CID AIR referencing the blood draw was provided to the defense counsel; the evidence does not establish bad faith by the government. Additionally, we reviewed the defense discovery request and conclude it only contained a generic request for laboratory reports. The defense discovery request did not specify the AFMES blood draw, its location, or its materiality.

As to whether defense counsel were ineffective regarding their failure to interview Dr. █ or file a specific discovery request, we note counsel were aware of Dr. █'s opinion, annotated in appellant's medical records, that appellent may have

9

ingested bath salts or flakka[7]. Defense counsel were also aware appellant's hospital toxicology screening ordered by Dr. ▮ was negative for the use of any drugs, including marijuana, and appellant's hospital blood samples had been destroyed approximately two weeks after the murder.

Clearly the best practice would have been for defense counsel to interview Dr. ▮, but after our review of not only Dr. ▮'s affidavit to this court but also his *Dubay* testimony that appellant's blood was never sent to another laboratory to be tested for bath salts or flakka, we are not certain how much, if any, additional relevant information could have been gleaned from an in-person discussion with Dr. ▮. Even more persuasive to our analysis regarding Dr. ▮'s importance as a witness, the *Dubay* military judge determined a member of the prosecution team telephonically interviewed Dr. ▮ prior to appellant's trial and "Dr. ▮ provided little substantive information" to the prosecutor and "instead continually referred" him to the "emergency room records for any substantive information." Further, nothing within Dr. ▮'s affidavit or his *Dubay* testimony establishes he was aware of the separate blood draw and sample residing at AFMES such that interviewing him would have triggered a further investigation by defense, or even the government, as to the results of the AFMES test or, more importantly, whether another sample of appellant's blood remained.[8]

We now turn to review the record to determine if the government's failure to respond to the defense's generic discovery request for laboratory reports or the defense counsel's failure to specifically request such information after their receipt of the CID AIR establishes a reasonable probability a different result at trial would have occurred had evidence of the test been disclosed or requested. It does not.

We first discuss appellant's wavering position regarding whether he was intoxicated by anything other than alcohol. In an affidavit to this court, appellant asserted, under penalty of perjury, that his trial stipulation of fact "was not true" when he agreed he "was not intoxicated on anything other than alcohol." At trial, however, appellant agreed "under oath" his stipulation of fact was accurate and true and he "was under no intoxicating influence other than alcohol." Appellant read the entire stipulation in court, agreed everything was true, asserted there was nothing in the stipulation he did not wish to admit was true, and agreed "under oath that the matters contained in the stipulation [were] true and correct to best of his knowledge

---

[7] The *Dubay* Judge described "flakka" as a foreign substance which may have been included in the marijuana appellant alleges he smoked with "Cowboy." We reiterate that appellant's toxicology screening contained no indication of any marijuana use to support the theory of "flakka" laced marijuana raising an intoxication defense.

[8] As we find appellant was not prejudiced by his counsel's failure to interview Dr. ▮, the issue of whether their conduct was ineffective in this regard is moot.

and belief." We need not resolve the factual discrepancy between appellant's two varying assertions or further ponder whether his "under oath" contrasting statements form the basis of a false official statement offense, because in "a guilty-plea case . . . [appellant] may not use his post-trial affidavit . . . to contradict his guilty plea and his sworn admission of the facts supporting them." *United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997). *See United States v. Martin*, ARMY 20080519, 2010 CCA LEXIS 347, (Army Ct. Crim. App 28 Sep. 2010) (mem. op.).

Even more persuasive to our analysis, the military judge, in an abundance of caution, provided appellant with not only the instruction for voluntary intoxication but also discussed the possibility that appellant may have smoked another substance. *See* Dep't of Army, Pam. 27-9, Legal Services: Military Judges' Benchbook, para. 5-12 [Benchbook]. The military judge directly asked appellant, "even though you thought you were smoking marijuana, and apparently you weren't, whatever you were smoking, you agree that you were not intoxicated by whatever that substance was, is that right?" Appellant responded he understood the defense of voluntary intoxication, that whatever he smoked had no intoxicating influence because he had control over his mental and physical actions, and he possessed the specific intent to kill his wife.[9]

The following discussion between the military judge and appellant is revealing and pertinent:

MJ: And whatever else you might have smoked in the car with Cowboy a couple hours before [the murder], that wasn't influencing you in any way?

ACC: No, Your Honor.

MJ: At the time you stabbed your wife?

ACC: No, Your Honor.

MJ: Okay. So then, Sergeant Colbert, do you affirmatively disclaim the defense of voluntary intoxication?

ACC: Yes, Your Honor.

Beyond appellant's own trial assertions negating any lack of mental responsibility defense, his defense counsel, who were aware of Dr. ███'s

---

[9] Appellant's stipulation of fact and discussion with the military judge asserting he was coherent when he murdered his wife was also apparently corroborated by the paramedics who arrived at the scene immediately after the murder.

observations regarding appellant's possible ingestion of a substance like flakka, considered and rejected a case theory based on any alleged decreased *mens rea* defense. Appellant's civilian trial defense counsel addressed any alleged defense of lack of mental responsibility in his affidavit to this court noting that appellant's alleged consumption of any illicit substances occurred after he took substantial steps in preparation to murder his wife. Specifically, defense counsel stated:

> [t]he alleged drug use would be put up against the fact that [appellant] purposefully pursued his wife, having purchased the knife and binoculars the day before, secured a vehicle he thought his wife would not immediately recognize, text messaged his friend of his intent moments before the act, and finally lying in wait for her to appear. Those acts then being compounded by the apparent brutality of the crime all seem to cut against a drug induced impulse and looked much more like a considered and deliberate path.

We agree with defense counsel's assessment of the evidence and appellant's assertions that he possessed the mental capacity to murder his wife, despite any alleged drug usage, and find that a reasonable probability of a different result at trial does not exist had the AFMES blood draw been disclosed or preserved by the government or requested by the defense.

*Appellant's Pre-Sentencing Phase*

During the pre-sentencing phase, the defense counsel called four witnesses and appellant gave an unsworn statement for a combined total of less than seventy pages of witness testimony in the verbatim record. Counsel also introduced a twenty-five page "good soldier book."

The four defense witnesses were appellant's step-mother, biological mother, father, and Lieutenant Colonel (LTC) ▮, a psychology expert.[10] Defense counsel did not call any additional civilian or military character witnesses identified by either appellant or his step-mother to testify regarding appellant's seven years of service, including a combat deployment.

The *Dubay* military judge found appellant's trial defense team did not even *interview* four military pre-sentencing witnesses proffered as potentially favorable

---

[10] On appeal, appellant claims LTC ▮ was not an adequate substitute pre-sentencing expert witness proffered by the government in lieu of appellant's initially requested specific expert psychologist, and LTC ▮'s direct testimony lacked persuasiveness which was further exploited by the government in their rebuttal case by a more qualified government expert. Our disposition of the IAC claim renders this issue moot.

by appellant because the civilian defense counsel "decided he wanted the defense's sentencing case to focus on the appellant's remorse, accountability and family." The *Dubay* military judge found the defense team, for this same alleged tactical reason, did not interview any witnesses on a list of "around ten names with contact information" provided by appellant and his step-mother identifying defense favorable "family members and childhood/school friends."

We find defense counsel were ineffective for failing to *interview* approximately fourteen pre-sentencing witnesses proffered by appellant as potentially favorable. *See United States v. Saintaude*, 56 M.J. 888 (Army Ct. Crim. App. 2002) (holding appellant's defense team were ineffective during the sentencing phase for failing to investigate appellant's background for potential mitigation evidence). Defense counsel's alleged "tactical decision" to pursue a certain strategy, while declining to interview fourteen potentially favorable pre-sentencing witnesses, is not within the wide range of reasonable professional assistance expected of a defense attorney. Defense counsel's failure to interview several "family members and childhood/school friends" appears to be in direct contrast to the stated objective of focusing the pre-sentencing case on appellant's "family."

Having found appellant's counsel were ineffective, we must determine if appellant was prejudiced by his counsel's failures. We must determine if "[a] reasonable probability [exists] that the sentence would have been different but for counsel's performance, and that probability is sufficient for us to question the reliability of and to undermine our confidence in the sentencing proceeding." *United States v. Boone*, 44 M.J. 742, 746 (Army Ct. Crim. App. 1996), *rev'd on other grounds*, 49 M.J. 187 (C.A.A.F. 1998). *See also United States v. Weathersby*, 48 M.J. 668 (Army Ct. Crim. App. 1998).

Facing a confinement range of zero days to life without the possibility of parole, the military judge adjudged the maximum sentence.[11] Although we recognize appellant pleaded guilty to intentionally murdering his wife, an offense likely warranting significant confinement, we note the military judge declined the option to sentence appellant to life with the possibility of parole. Defense counsel's asserted tactical decision and presentencing case was not based on an investigation or reasoned assessment of approximately fourteen alleged defense favorable witnesses and we are not confident in the sentence that appellant received because of his counsel's failures. A reasonable probability exists appellant might not have received the maximum sentence of life without the eligibility parole – a sentence forever precluding his opportunity to petition a parole review board and ensuring imprisonment until his death – but for his counsel's ineffectiveness.

---

[11] As a result of the sentence he received, appellant will be confined for the remainder of his life and will not be eligible for parole by any official. *See* Benchbook para 2-5-22.

## CONCLUSION

On consideration of the entire record, the finding of guilty of Specification 2 of Charge I and of Charge I is AFFIRMED. The sentence is SET ASIDE. A rehearing on the sentence is authorized.

Judge HAYES and Judge PARKER concur.

FOR THE COURT:

JAMES W. HERRING, JR.
Clerk of Court